

EXHIBIT ___
PAGE ___ OF ___

RE:    **SULLIVAN, Cyrus Andrew**

*Not For Further Disclosure Without Prior Authorization From the Court*

### The Offense Conduct

8.    On July 19, 2013, The Honorable Marco A. Hernandez sentenced Cyrus Sullivan to 24 months in prison followed by three years supervised release after he was convicted of Making Threatening Communication in United States District Court case number 13CR00064-HZ. Sullivan was remanded to Bureau of Prisons (BOP) custody with an expected release date of July 2, 2014. Pursuant to BOP policy, on January 21, 2014, Sullivan was placed at the Northwest Residential Reentry Center (NWRRC) in Portland, Oregon, to begin the pre-release component of his sentence. The pre-release component is implemented to allow the inmate an opportunity to obtain the services and skills necessary to assimilate back into society following a custodial sentence.

9.    Upon arrival at NWRRC, all rules and regulations of the program were discussed in their entirety with Sullivan, along with his conditions of supervised release which prohibited him from computer access. Sullivan was agitated that he could not access the computer nor could he obtain employment managing websites. Between January and April 2014, several meetings occurred between defendant, NWRRC staff and Senior U.S. Probation Officer Rene Worthey in an attempt to gain Sullivan's compliance with Court orders and to assure successful completion of his NWRRC program. During these meetings, Sullivan adamantly expressed his unwillingness to obtain employment that did not require internet access. NWRRC staff told Sullivan he was required to obtain approved employment within 30 days in order to continue his pre-release status at the residential re-entry facility. Sullivan however, refused to make accommodations that would allow him to successfully program while at NWRRC and maintain compliance with his release conditions.

10.   Also while at NWRRC, defendant told staff that anyone who works against him will be "engaged in war." NWRRC staff reported that defendant said, "Rene Worthey is overstepping her authority and she needs to grow a fucking brain." He also noted that he moved his websites to Europe so the government could not "screw with him there." Sullivan acknowledged that when he is mad at people he curses and makes threats.

11.   On April 21, 2014, defendant had a meeting with NWRRC Social Service Coordinator W.S. for the purpose of discussing Sullivan's non-compliance with job search expectations. W.S. and Sullivan were reviewing a NWRRC Resource Room Computer Use Contract which Sullivan had previously refused to sign, because it prohibited him from accessing his former e-mail accounts that he had previously used in criminal activities. During the review of this form, Sullivan became agitated and stated he would not sign the form as it was unconstitutional. He was defensive and W.S. noticed that his body language was tense, his jaw clenched, and his voice began to shake.

12.   In an attempt to diffuse the situation, W.S. made an effort to empathize with defendant and asked open ended questions related to other forms of employment as she attempted to engage defendant in conversation related to how the BOP could assist defendant. Sullivan responded by saying that he was being released to ███████████ and he planned to "sit around and do nothing." W.S. told him this was not a viable option and Sullivan became quiet and stared at her. He then said, "You know

4

3:14-CR-0090-HZ

EXHIBIT 17
PAGE 2 OF 3

RE:   **SULLIVAN, Cyrus Andrew**

*(run my business)*

what I fucking want to do." Sullivan said he would not sign the contract nor comply with employment expectations. W.S. directed that they end the conversation until they could come to a mutual agreement. Defendant continued to stare at her until W.S. asked him to leave her office telling him they could talk later if he was interested.

13.   As Sullivan slowly exited the office, W.S. thought his movements looked as if he was going to slam the door on his way out, and said, "Please do not slam the door." Sullivan threw the door open, pretended to slam it but caught it before it closed. W.S. went to the door to make sure Sullivan had left the Resource Room and heard Sullivan cursing and telling her she was "fucking with the wrong person an she shouldn't cross him." W.S. asked Sullivan to leave the room and come back later when he was willing to have a conversation. Sullivan darted towards W.S. as she pushed the panic alarm. He slapped her hard on the left side of her face, and when she screamed he punched her in the face. As the victim attempted to steady herself, defendant shoved her in the upper back and she fell over a chair and slammed into a wall, injuring her right wrist.

14.   During the commotion, an NWRRC case manager, H.K. heard Sullivan say in a raised voice, "This is fucked up," and then heard W.S. say, "Don't slam my door." H.K. went to W.S.'s office and saw Sullivan attack W.S. H.K. told Sullivan to back away but he would not comply; so H.K. tried to get between defendant and W.S. but Sullivan swung a closed fist at H.K., missing her. A third employee rushed in to help and grabbed defendant and secured him in a restraining hold as they struggled down the hallway towards the case management area of the facility. Defendant was told to calm down but managed to free his elbow from the restraining hold and hit the case manager on the right side of the face. Port of Portland Police arrived within ten minutes and placed defendant into custody until Portland Police arrived and transported defendant to Multnomah County Jail. Defendant declined to make any statements.

15.   W.S. suffered from swelling and bruising of her right wrist. She rated her pain as eight, on a scale of 1 to 10. She also had bruising on the left side of the face, where she had been slapped and punched. Further extent of her injuries is unknown, as she has not returned the requested victim impact statement. Sullivan was originally charged with Assault in the Fourth Degree, and Attempted Assault in the Fourth Degree, in Multnomah County Circuit Court case number 140444244. Said charges were dismissed on April 30, 2014, in lieu of federal prosecution. The federal Indictment was true billed May 7, 2014.

16.   While defendant was in custody of the U.S. Marshals on this case, he was transferred from Columbia County Jail to FCI Sheridan. Prior to his departure, jail staff found a "hit list" in Sullivan's possession that included the names of everyone who had investigated, prosecuted, and adjudged him in the past year or so in his possession. Assistant U.S. Attorney Sean Hoar was made aware of the list and brought it to the attention of the probation officer. This list has been provided to defense counsel.

**Victim Impact**

17.   The provisions of the Mandatory Victim Restitution Act of 1996 apply to this Title 18 offense. A Declaration of Loss Statement has been sent to victim W.S. but she did not

*\* There was s no punch on the video tape.*

*3:14-CR-00190-HZ*

*Not For Further Disclosure Without Prior Authorization From the Court*



**RE:    SULLIVAN, Cyrus Andrew**

EXHIBIT 11
PAGE 3 OF 3

*Not For Further Disclosure Without Prior Authorization From the Court*

return it. In an email conversation with her, she indicated she did not know the amount of her medical expenses as most had been covered by insurance and she was still receiving treatment for her wrist. W.S. has not submitted a request for restitution to date.

17a.   W.S. submitted a victim impact which I have summarized below. The statement has been submitted under separate cover to the Court.

> This attack was unprovoked and occurred simply because Mr. Sullivan did not get his way. Mr. Sullivan refused to job search, participate in vocational activities, or consider alternatives to running his former websites. He became agitated during a conversation related to his current status at NWRRC and was argumentative when asked to leave the Resource Room. Instead of following directions to leave he slapped me across the face, punched me in the face and shoved me so hard into the wall that the wall caved and dented. My face was black and blue and swollen, and my hand swelled to four times its normal size. I also suffered from a neck sprain. I now have permanent damage to my hand and have missed a considerable amount of work due to medical appointments, physical therapy, and counseling. I have also experienced Post Traumatic Stress Disorder because of the attack.

### Adjustment for Obstruction of Justice

18.    The probation officer has no information indicating the defendant impeded or obstructed justice.

### Adjustment for Acceptance of Responsibility

19.    Sullivan pled guilty to the instant offense in a timely manner, thus, a two-level reduction for acceptance of responsibility is recommended. USSG §3E1.1 (a).

### Offense Level Computation

20.    The 2013 Guidelines Manual, incorporating all guideline amendments, was used to determine the defendant's offense level. USSG §1B1.11.

### Count 1: Assault of a Federal Employee

21.    **Base Offense Level:** The guideline for violations of 18 U.S.C. § 111 is found at USSG §2A2.4 and requires a base offense level of 10.                                                     **10**

22.    **Specific Offense Characteristics:** Pursuant to USSG §2A2.4(b)(1)(A), if the offense involved physical contact a three-level enhancement is warranted. Sullivan attacked W.S.; thus, this enhancement is applied.                                                     **+3**

23.    **Specific Offense Characteristics:** Pursuant to USSG §2A2.4(b)(2), as the victim sustained bodily injury both on her wrist and her face, a two-level increase is warranted.                                                     **+2**

3:14-CR-00190-HZ

EXHIBIT ___118___
PAGE __1__ OF __1__

Sullivan Resource Room Contract:

**<u>Before you begin job searching you must:</u>**

Complete ALL packet work including:

1) Resume
2) Cover Letter
3) Criminal History Statement
4) Job Hurdles
5) Master Application
6) You must create a professional, new email and you may not use/access your previous Hotmail account (or ANY past accounts). This new account cannot be linked to any accounts that you currently have.

**\*Packet work will be completed no later than Wednesday 2nd, 2014.**

**<u>Access to the RR Computers:</u>**

1) You may only have access to the computer between 12:30 PM and 3:30PM, M-F.
2) Please check in with staff no later than 12:30 PM to schedule your time.
3) <u>You will be given one hour to complete your job search.</u>
4) You will sign in and out on the RR computer log sheet.

**<u>Parameters for job searching:</u>**

1) You may go to the following two websites: Simply Hired and Craigslist. If a website attempts to navigate you to a third party website you MUST talk to Resource Staff before going to it.
2) Computer use is restricted to employment programming. This includes updating your resume, cover letter, and criminal history statement.
3) Email correspondence is reserved for job search only.
4) You will apply to 6-10 jobs a week and document this in a daily job log. You will be required to turn in a job log every Friday no later than 5:00pm.
5) You may not apply to computer related jobs. You must apply to a minimum of **6** jobs a week that are not computer based.

\*Increased access to the computer will be reviewed if you remain in compliance with this contract.

\* You may be required to participate in employment services in the community. You will not be allowed to use the computer while in the community.

I have read and understand the requirements and expectations of me. I agree to abide by these requirements, and understand that my failure to do so will result in loss of access to the Resource Room.

Resident Signature:_____ Date:_____

Staff Signature:_____ Date:_____

EXHIBIT 119
PAGE 1 OF 2



Thank you for agreeing to help me. Included in this mailing is a copy of my press release. This is the web version and it is written specifically for online publication. Online press releases have certain requirements that this one should fit exactly. It is important that you transcribe it word for word with the corrections I've noted in pen. Do not change it at all no matter what your opinion is or what insights you may want to contribute to it. The last thing I want to see is a butchered version of this published because you felt that was best. Publish it all or not at all.

Publish it at one of the following 3 press release distribution services. They are in priority from best to worst. If the first does not work then use the second, then the third if necessary.

1. SubmitMyPressRelease.com

user name: ██████████ or ██████████
password: ██████████ or ██████████
note: Purchase a rather basic press release distribution package for $25. If I recall that was the going rate in 2012. If it costs more now that is ok. Use my ████████ credentials which you should still have written down to pay for it.

2. 24-7-press-release.com

user name: ██████████ or ██████████
password: ██████████ or ██████████
note: Should still offer a free service and a premium one for a couple hundred dollars. Try the free service first and then discuss the other with me depending on the results. Hopefully a premium is not needed.

3. free-press-release.com

user name: ██████████ or ██████████
password: ██████████ or ██████████
note: Absolute garbage service, but I have a credit with them that should slightly increase exposure for about $1.

Each of those services have several categories to choose from. Choose the ones most relevant to law, health, celebrities, etc. Such as legal , entertainment, health, crime, celebrities, gossip, etc.

Each service should allow you to add tags. Tags are relevant keywords that help direct search engines and ultimately users to the article. Use the follow -ing tags:

STDs, Prison, BOP, Crime, Health, Stalker, Threats, Anderson Cooper, Celebrities, tv, entertainment.

Each service may also ask for a brief summary of the story.

EXHIBIT __119__
PAGE _2_ OF _2_

That summary should be as follows:

The imprisoned founder of a controversial website has been wrongfully sent to a penententiary due to an error by the Federal Bureau of Prisons. Shining light on a more widespread prison problem and an effort to censor the internet.

That should be all you need for now. If you need to use different tags or categories that is ok. — Just keep them relevant.

If the summary is too long just use the first sentence.

Remember my list of passwords for ████ and other accounts that you should still have. If the usernames don't work try using the email addresses ████████████ and ████████████

Thanks again for your help.

████████

WS 2/15/15

EXHIBIT _120_

PAGE _1_ OF _2_

Web Version

_e PS

TV Show Subject Wrongfully Sent to Penetentiary

S (USP)

The founder of STD Carriers Disease Control and Prevention Services has
been wrongfully sent to the United States Penetentiary in Victorville,
California after the Federal Bureau of Prisons (BOP) erroneously or
intentionally inflated his custody level from medium to high on false
pretenses. Previously housed at the medium security Federal Correctional
Institution (FCI) in Sheridan, Oregon Cyrus Sullivan is now considered too
dangerous for that facility due to a non-existant escape and a slap in the
face that raised his history of violence to serious when it is in fact minor
.

In 2014 Sullivan received a 24 month sentence for assaulting a federal
employee  to be served consecutively to the 24 months he was already
serving for sending a threatening email to his stalker, a Portland woman
whose ex-boyfriend had published her STD status on Sullivan's website.
Instead of treating Sullivan as the real victim that he was the government
threw the book at him saying among other things that threatening him, his
family, calling in a bogus 911 call falsely accusing him of holding hostages
at his home, and libeling him with actual malice were all understandable
under the circumstances. Those circumstances being without legal recourse
to compel the removal of truthful and damaging information published online
by one of Sullivan's users. At sentencing U.S. District Judge Marco
Hernandez ordered that Sullivan could not access a computer or direct a
third party to access one for him while on release without permission from
a probation officer. Those conditions are currently being challenged in the
9th Circuit Court of Appeals because they are unconstitutional. It was abuse
of those conditions in a failed effort to force Sullivan back into court to
seek modification of those conditions just to use a computer to look for work
and in the process force him to file a second appeal that led Sullivan to
slap a staff member at the Northwest Regional Re-Entry Center (NWRRC) in
April of 2014.

Sullivan did commit the assault, but was never accussed of escaping or
attempting to escape in the process. Still Sullivan has an escape on his BOP
disciplinary record for the incident. Sullivan is not alone in his confusion
because it turns out that BOP treats every inmate that leaves NWRRC or any
other community correctional facility for any reason other than successful
completion of the program as an escapee. When confronted with what looked
like an obvious computation error Sullivan's case manager at USP Victorville
surprisingly defended the error saying "you escaped because of your behavior
" even though none of his behavior included so much as an accusation of
escape as defined by the English language dictionary.

Sullivan also had his history of violence wrongfully increased from minor
to serious even though BOP policy requires behavior "likely to cause serious
bodily harm...(e.g. aggravated assault)" for violence to be considered
serious. Had Sullivan actually committed an aggravated assault he would have
been sentenced under United States Sentencing Guidelines section 2A2.2
instead of section 2A2.4 for obstructing or impeding officers. Conflictingly
and accurately BOP correctly categorized the serousness of his current
offense as moderate for a less serious assault. Had BOP wrongfully called

EXHIBIT 120
PAGE 2 OF 2

his assault serious  when determining severity of his current offense it would have been of the greatest severity level.

Sullivan has 24 points. The bare minimum to be housed at a USP. A proper reduction in either category would put him back at the medium security facility where he belongs. Unfortunately, according to BOP officials he must wait at least 6 months for a cutody review unless staff at the prison take steps to correct the error, but in order to do that they would have to first stop defending the error and then request that it be corrected at the Designation and Sentence Computation Center in Grand Prarie, Texas.

Sullivan was the subject of a March 2012 episode of Anderson hosted by Anderson Cooper. Cooper was outraged by Sullivan's STDCarriers.com website that allowed anyone to anonymously list people online as STD Carriers. Sullivan was arrested in June of that year and has been in custody ever since with a projected release date of March 2016.

For More Information Visit:

STD Carriers Still on Twitter
twitter.com/STDDatabase

Coverage of Sullivan's Sentencing:
OregonLive.com search site for "stdcarriers.com" of "Cyrus Sullivan"

YouTube Channel Featuring Cyrus Sullivan on Anderson
YouTube.com/user/NoLimitList

###

EXHIBIT 121
PAGE 1 OF 13

No. 14-8917

IN THE

# Supreme Court of the United States

CYRUS ANDREW SULLIVAN,

*Petitioner,*

v.

THE UNITED STATES OF AMERICA,

*Respondent.*

On a Petition for a Writ of Certiorari
to the Ninth Circuit Court of Appeals

## PETITION FOR A WRIT OF CERTIORARI

Bronson D. James
*Counsel of Record*
BRONSON JAMES LLC.
917 S.W. Oak St, Ste 219
Portland, OR 97205
(503) 943-6876
bj@bronsonjames.com

EXHIBIT  _12_/_
PAGE  _2_ OF _13_

## QUESTIONS PRESENTED

Is access to the Internet so integral to modern living and intertwined with First Amendment expression that court imposed release restrictions on that access must be narrowly tailored?

EXHIBIT __121__
PAGE __3__ OF __13__

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................ i

TABLE OF AUTHORITIES................................. ii

PETITION FOR A WRIT OF CERTIORARI ....... 1

LIST OF PARTIES ................................................ 1

OPINIONS BELOW .............................................. 1

JURISDICTION ................................................... 1

CONSTITUTIONAL PROVISIONS .................... 1

STATEMENT OF THE CASE ............................. 2

REASONS TO GRANT THE WRIT ..................... 4

CONCLUSION ..................................................... 8

APPENDIX

ORDER OF THE NINTH CIRCUIT.................. 1a

JUDGMENT OF DISTRICT COURT................. 4a

EXHIBIT _12_
PAGE _4_ OF _13_

ii

# TABLE OF AUTHORITIES

## Constitutional Provisions

U.S. Const. Amend. I........................................1

U.S. Const. Amend. V........................................1

## Cases

*City of Ontario, Cal. v. Quon*, 560 U.S. 746, 130 S. Ct. 2619, 177 L. Ed. 2d 216 (2010)...................... 5

*Federal Election Commission v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007) ............................ 6

*Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (1997)............... 5

*United States v. Crandon*, 173 F.3d 122 (3d Cir. 1999) ........................................................ 7

*United States v. Freeman*, 316 F.3d 386 (3d Cir.2003) ................................................. 7

*United States v. Paul*, 274 F.3d 155 (5th Cir.2001) ................................................. 6

*United States v. Ristine*, 335 F.3d 692 (8th Cir.2003) ................................................. 6

*United States v. Scott*, 316 F.3d 733 (7th Cir.2003) ................................................. 7

*United States v. Sofsky*, 287 F.3d 122 (2d Cir.2002) ................................................. 7

*United States v. Walser*, 275 F.3d 981 (10th Cir.2001) ................................................. 6

*United States v. White*, 244 F.3d 1199 (10th Cir.2001) ................................................. 7

EXHIBIT _12 1_
PAGE _5_ OF _13_

iii

*United States v. Zinn,* 321 F.3d 1084 (11th
    Cir.2003) ................................................................ 7

### Statutes

18 U.S.C. § 3553(a)(1) ............................................. 4, 5

18 U.S.C. § 3583(d) .................................................... 5

18 U.S.C. §875(c) .................................................... 1, 7

28 U. S. C. § 1254(1) .................................................. 1

EXHIBIT _12 1_

1    PAGE _6_ OF _13_

## PETITION FOR A WRIT
## OF CERTIORARI

Petitioner Cyrus Andrew Sullivan respectfully petitions for a writ of certiorari to review the judgment of the Ninth Circuit Court of Appeals in Case No. 13-30207, affirming his sentence and his conditions of release for his conviction of Making a Threatening Communication, 18 U.S.C. §875(c).

### LIST OF PARTIES

Petitioner is Cyrus Andrew Sullivan, defendant-appellant below. Respondent is the United States of America, plaintiff-appellee below. All parties appear in the caption of the case on the cover page.

### OPINIONS BELOW

The order of the Ninth Circuit Court of Appeals (Pet. App. 1a) and the relevant District Court proceedings and order are unpublished.

### JURISDICTION

The Ninth Circuit Court of Appeals issued its order on December 16, 2014. This Court has jurisdiction pursuant to 28 U. S. C. § 1254(1)

### CONSTITUTIONAL
### PROVISIONS

The First Amendment to the United States Constitution states in relevant part:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech...

The Fifth Amendment to the United States Constitution states in relevant part:

> No person shall be...deprived of life, liberty, or property, without due process of law...

## STATEMENT OF THE
## CASE

Cyrus Sullivan is a provocateur. He deliberately pushes the bounds of free speech in ways that are offensive and objectionable – but ultimately lawful, and constitutionally protected.

Mr. Sullivan ran a number of websites that served as platforms for users to post information about others. One of these websites, www.stdcarriers.com, provided a forum for jilted ex-lovers to "out" former partners as having a sexually transmitted disease.

If a person found his or her name listed on the site as a person with an STD, that person had various options to seek the listing's removal. The person who originally posted the information could at any time remove the listing by simply logging into the site and deleting the posting. Petitioner encouraged listed persons to talk with the person who posted the information about removing it. Alternatively, Mr. Sullivan would remove the posting if the listed person provided medical records showing the person did not have an STD.

Alongside the various websites Mr. Sullivan operated such as stdcarriers.com he launched nolimitlist.com, which, among other functions, allowed users to clean up their online reputation by paying a fee of between $400 to $1000. Upon receipt of the fee, Petitioner would perform a function that would limit the ability of search engines like Google to lead web surfers to the person's name on the STD website, a sort of reverse form of search engine optimization.

Stdcarriers.com expectedly garnered significant backlash, national medial attention, and the interest of federal law enforcement. Despite the outcry, the site was never held to be unlawful.

One person listed on the site, A.K. contacted

EXHIBIT 121
PAGE 8 OF 13
3

Mr. Sullivan to remove her information. This began a long series of email interactions between Mr. Sullivan and A.K. That email exchange eventually escalated to threats, name-calling, and histrionics from both side. Ultimately, Mr. Sullivan said in one email: "You don't learn your lessons, do you? Now I have no choice but to come to your house armed and put an end to you once and for all." Sentencing Tr at 7. It was that sentence, in that one email, that formed the basis for a prosecution and conviction for Making a Threatening Communication, 18 U.S.C. §875(c). And with that prosecution, the government finally saw an opportunity to shut down Mr. Sullivan's sites, such as stdcarriers.com.

Before the District Court Mr. Sullivan entered a plea of guilty. However, upon sentencing, the District Court imposed two objectionable conditions, both clearly designed to shut down Mr. Sullivan's offensive, but lawful, websites. The District court made that clear when it said "the notion that you're going to continue with your website, it's not happening... I am taking it away from you." Sentencing Tr 45-46. The conditions were:

"7.    The defendant is prohibited from using or possessing any computer(s) and/or directing third parties to do so on his behalf (including any handheld computing device, any electronic device capable of connecting to any on-line service, or any data storage media) without the prior written approval of the U.S. Probation Officer. This includes, but is not limited to, computers at public libraries, Internet cafes, or the defendant's place of employment or education.

"8.    The defendant is prohibited from accessing any on-line computer service and/or directing third parties to do so on his behalf at any location (including employment or education) without the prior written approval of the U.S. Probation Officer."

4    EXHIBIT __12__
PAGE __9__ OF __13__

These conditions sweep so broad as to prevent Mr. Sullivan from engaging with the modern world. Not only is he prevented from possessing a computer, he's prevented from using one, or having someone use one on his behalf. He is prevented from accessing any device connected online, or from having anyone do so for him. Under these conditions he cannot function in society. He cannot bank or have anyone help him bank. He cannot access health records, nor can his doctor access those records on his behalf if they are electronic. He cannot pay by credit or debit card. He cannot shop for groceries if doing so requires swiping a Safeway Club Card for example. He cannot communicate with anyone via email, cannot read the news online, or stream a movie, or download music or shop online. What's more, no one can assist him with those functions. Someone buying something at Amazon.com on behalf of Mr. Sullivan and shipping it to him would be a violation. And ultimately, as the District Court clearly intended, Mr. Sullivan could not run his Internet based business, nor turn it over to someone else to run on his behalf.

Mr. Sullivan challenged these conditions on appeal. The Ninth Circuit held that the conditions were not unlawful. This Petition for Certiorari followed.

## REASONS TO GRANT
## THE WRIT

I.    **The Internet is the dominant modern first amendment forum; this Court should announce that release conditions affecting Internet access must be narrowly tailored.**

Release conditions must be reasonably related to the factors set forth in 18 U.S.C. § 3553(a)(1) & (2)(B)-(D). In imposing conditions of supervised release, the sentencing court may consider: (1) the nature and circumstances of the offense and the

EXHIBIT \_\_12\_\_

PAGE \_\_10\_ OF \_13\_

5

history and characteristics of the defendant; and (2) the need for the condition to deter future criminal conduct, protect the public, and provide the defendant with necessary training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a)(1) & (2)(B)-(D). Under 18 U.S.C. § 3583(d), conditions of supervised release "must: (1) be reasonably related to the goals of deterrence, protection of the public, and/or defendant rehabilitation; (2) involve no greater deprivation of liberty than is reasonably necessary to achieve those goals."

The Internet is now the dominant source of access to news, opinion, and critical information. It is how people order their lives. The Internet accesses financial records, health records, and other critical life documents. It is the gateway to employment, both in searching for work, as well as applying for a job. Finally, it is a critical mechanism for basic communication, staying in touch with relatives, and talking with loved ones.

As this Court noted the Internet "provides relatively unlimited, low-cost capacity for communication of all kinds...Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox. Through the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (1997). And access to electronic communication is a modern method of self-identification. *City of Ontario, Cal. v. Quon*, 560 U.S. 746, 760, 130 S. Ct. 2619, 177 L. Ed. 2d 216 (2010).

Because an Internet capable computer is the nexus for a host of First Amendment activities, removing access to such a device can be permissible only in the most narrow of circumstances – circumstances not present in this case. When faced with a close call, "the First Amendment requires [courts] to err on the side of protecting * * * speech

EXHIBIT _12_1_
PAGE _11_ OF _13_

6

rather than suppressing it." *Federal Election Commission v. Wisconsin Right to Life, Inc.,* 551 U.S. 449, 457 (2007).

## II.   Computer and Internet bans as a condition of release, or probation, are common throughout the federal and state criminal systems

Mr. Sullivan is not alone in being subject to a ban of computer use, although the prohibition extending to third parties acting on his behalf is unusual.    Throughout the state and federal criminal systems defendants are routinely subject to similar restrictions.

Although computer and Internet bans are most frequently seen in cases of child pornography, they are being increasingly applied in a wide ranging array of cases, from white collar fraud to cases only tangentially related to internet use.

This case provides a vehicle for this Court to provide guidance in an area affecting thousands of criminal cases nationwide.

## III.   Lower courts are split on the standard for evaluating the constitutionality of computer and Internet use restrictions

. Lower courts are divided in both their result and the methodology for analyzing computer and Internet restrictions.    A number of circuits have upheld restrictions similar to Mr. Sullivan's. *See, e.g., United States v. Paul,* 274 F.3d 155, 169–70 (5th Cir.2001) (upholding complete ban); *United States v. Walser,* 275 F.3d 981, 988 (10th Cir.2001) (upholding prohibition where offender could use the Internet with permission of the probation office); *United States v. Ristine,* 335 F.3d 692, 696 (8th Cir.2003) (district court did not commit plain error in restricting defendant's use of computer and access to Internet where defendant had possessed and exchanged pornographic images with other

EXHIBIT 1__1
PAGE 12 OF 13

Internet users and defendant could still possess computer with permission of his probation officer); *United States v. Zinn*, 321 F.3d 1084, 1093 (11th Cir.2003) (limited restriction on child pornography offender's Internet usage was reasonably related to legitimate sentencing considerations); and *United States v. Crandon*, 173 F.3d 122, 127–28 (3d Cir. 1999) (upholding Internet ban)

Other circuits have reached opposite results. *See, e.g., United States v. Sofsky*, 287 F.3d 122, 126 (2d Cir.2002); *United States v. Freeman*, 316 F.3d 386, 391–92 (3d Cir.2003); *United States v. White*, 244 F.3d 1199, 1206 (10th Cir.2001); and *United States v. Scott*, 316 F.3d 733, 737 (7th Cir.2003) (indicating that a record of "extensive abuse" of digital communications, as opposed to only a few images of child pornography stored on a computer, could justify an outright ban on the Internet).

This disagreement among the circuits — which is echoed in state treatment — requires resolution. The imposition of Internet restrictions as a condition of release or probation will not diminish, it will only expand. The time has come for this Court to bring conformity to the legal analysis below.

## IV. This case provides a good vehicle to address the issue

This case provides this Court a good vehicle to address the constitutionality of Internet use restrictions. First, the restriction here is one of the most extreme counsel has encountered. Restrictions on ownership or access are common. But this restriction goes further by prohibiting access by third parties on Mr. Sullivan's behalf. As such, the restriction sweeps broadly and affects virtually all aspects of daily living.

Second, the crime of conviction in this case is Making a Threatening Communication, 18 U.S.C. §875(c). This case presents the issue without the complication of an Internet sex case, or child

8      EXHIBIT 12 1
PAGE 13 OF 13

pornography. The threat forming the basis of the
conviction was a single email. If Mr. Sullivan had
sent that threat via physical mail, would he be
banned from Post Office? The sweeping nature of
the ban, in contrast to the finite nature of the
crime, squarely frames the issue for this Court.

## CONCLUSION

For the foregoing reasons the petition for
writ of certiorari should be granted.


Respectfully submitted this 16th day of
March, 2015.

Bronson D. James
*Counsel of Record*
BRONSON JAMES LLC.
917 S.W. Oak St, Ste 219
Portland, OR 97205
(503) 943-6876

EXHIBIT __122__
PAGE __1__ OF __1__

---

**Cyrus Andrew Sullivan, Petitioner v. United States.**
**SUPREME COURT OF THE UNITED STATES**
**2015 U.S. LEXIS 2543**
**No. 14-8917.**
**April 20, 2015, Decided**

---

**Editorial Information: Prior History**

United States v. Sullivan, 588 Fed. Appx. 631, 2014 U.S. App. LEXIS 23611 (9th Cir. Or., 2014)
**Judges:** Roberts, Scalia, Kennedy, Thomas, Ginsburg, Breyer, Alito, Sotomayor, Kagan.

**Opinion**


Petition for writ of certiorari to the United States Court of Appeals for the Ninth Circuit denied.

© 2015 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

EXHIBIT 123
PAGE 1 OF 2

dropped pursuant to plea" U.S. v. Montano (2005, 398 F.3d 1276
). In order to prove actual innocence the defendant "must show
that in light of all the evidence it is more likely than not
that no reasonable juror would have convicted him." Luster v.
U.S. (1999, 168 F.3d 913).


## ACTUAL INNOCENCE OF INTERNET STALKING

18 U.S.C. 2261A states "whoever -- (2) with the intent to
...harass...uses...any interactive computer service...to engage
in a course of conduct that -- (B) causes, attempts to cause,
or would be reasonably expected to cause substantial emotional
distress to a person". Specifically Sean Hoar alleged that by
publishing or facilitating the publishing of information on the
internet I violated this statute because people claimed to have
experienced substantial emotional distress as a result of the
publications. I am obviously innocent of this charge. For a
couple of reasons. First, everything I personally publish is
absolutely 100% technically accurate and third parties that use
my services always agree to only publish truthful information.
Second, any  false information posted is in breach of contract
without my permission and any failure to remove negative publi-
cations are covered by my immunity under the Communications
Decency Act of 1996 (CDA). See Levitt v. Yelp! Inc. (2014, 9th
Cir. No. 11-17676) "theories of extortion for failure to remove
negative user reviews were covered by Yelp's immunity under the
Communications Decency Act of 1996 ("CDA"), 47 U.S.C. 230(c)(1)

E.C.F. 20

EXHIBIT _123_
PAGE _2_ OF _2_

". Lastly, Your Honor stated on the record at my Assault Case
sentencing on 11/3/2014 that Your Honor considers my websites
to be legal, so I'll let Your Honor speak for himself on this
one.

In my personal opinion I believe that Mr. Hoar had three
main objectives for this frivolous charge. First, it scared
people that otherwise would have helped me keep my business on
track out of doing so because they were afraid of being charged
as accomplices, accessories, or co-defendants. Second, it open-
ed the door to investigate the entire business operation with
the hope of finding any threats sent across state lines that
really would have violated 2261A or any other criminal statute
. Third, it would allow Mr. Hoar to introduce evidence at trial
that otherwise would have been irrelevant and prejudicial. Mr.
Hoar's win at all costs attitude is inappropriate and contrary
to the Supreme Court's defenition of what a prosecutor should
be "The United States Attorney is the representative not of an
ordinary party to a controversy, but of a sovereignty whose
obligation to govern impartially is as compelling as its oblig-
ation to govern at all; and whose interest, therefor, in a
criminal prosecution is not that it shall win a case, but that
justice be done...He may prosecute with earnestness and vigor
-- indeed he should do so. But, while he may strike hard blows,
he is not at liberty to strike foul ones." Berger v. U.S. (1935
, 295 U.S. 78).

E.C.f. 70          10

EXHIBIT 123
PAGE 3 OF 30

to get this departure under the circumstances. Especially when already arguing against a 2A6.1(b)(2)(A) enhancement on the grounds that I only sent one "true threat".



## INAPPROPRIATE RELEASE CONDITIONS

Mr. Olson failed at sentencing to object to supervised release conditions that violate my First Amendment Right to Freedom of Speech, are overly broad, and were imposed with no justification in the record. Mr. James and I believe these coditions to be illegal as well as unjustified. To save space I will rely on Mr. James' arguments presented in his brief to the Ninth Circuit (AB, p. 9-11) and his Writ of Certiorari to the Supreme Court.

Mr. Olson was instructed to find and make constitutional arguments against restricting my computer use for such a minor offense. Mr. James and I believe these conditions, specifically conditions 7 and 8, to be unconstitutional. Unfortunately I seem to be on the losing side of a circuit split that the Supreme Court has yet to clarify in which a few circuits including the Ninth do not consider computer restrictions illegal and others consider them unconstitutional. In the case of my appeal of these conditions the Ninth circuit cited other more serious cases in which computer bans were upheld, all involving child pornography that happened to be accessed using computers, and an inability to review for

E.C.f. 70

EXHIBIT 123
PAGE 4 OF 20

abuse of discretion due to my waiver of appeal (See Ninth Circuit
Order of 12/12/2014 in Case No. 13-30207). I signed that waiver
during the plea stage with the understanding that I would be rep-
resented by a reasonably competent lawyer to argue against any
computer use restrictions at sentencing. Had I known that Mr. Ol-
son would completely abandon me at sentencing I would not have
signed such a waiver or at least would have insisted on a waiver
that did not apply to contested sentencing issues. In this case
ineffective counsel at the plea phase also prejudiced the senten-
cing and appeal stages, see Daniels v. Woodford (2004, 428 F.3d
1181) "combination of counsel's guilt and penalty phase deficien-
cies...prejudiced the outcome of his penalty phase".


    At the sentencing hearing Mr. Olson had agreed to fight for
my right to use computers should the issue come up, but instead
elected to abandon his "overarching duty to advocate the defenda-
nt's cause [by]...Abandoning his tactic" White v. McAninch (2000,
235 F.3d 989) to argue against the proposed restrictions by sayi-
ng "I don't want to take the position that Mr. Sullivan should
just be able to do whatever he wants on the internet, on compute-
rs" (STR, p. 40). This resulted in me having to object myself
because Mr. Olson "constructively abandoned [me], and thus, we
must presume prejudice" Griffin v. U.S. (109 F.3d 1217). AFter my
objection Your Honor stated that Your Honor would consider that
when deciding how long to put me in prison before sentencing me
to the maximum end of the guidelines (STR, p. 46). See U.S. v.

E.C.F. 70



EXHIBIT 123
PAGE 5 OF 20

Ramsey (2004, 323 F Supp 2d 27) citing U.S. v. Cronic (1994, 466 U.S. 648) "where counsel's presence is so useless that the defendant for all intents and purposes, is without a lawyer, or where 'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing' then courts evaluating the defendant's ineffective assistance claim may presume that a competent lawyer could have achieved a different result...and no specific showing of prejudice is required".

To his credit Mr. Olson did include an argument about vagueness and overbreadth in his memo (DSM, p. 20-21), but that was only after I complained about him not using any case law at all in his initial draft. He never cited any First Amendment cases such as U.S. v. Sales (2007, 476 F.3d 732), U.S. v. Sofsky (2002, 287 F.3d 122), or U.S. v. Freeman (2003, 316 F.3d 386) all of which oppose computer restrictions in more serious cases. It is my hope that Your Honor would be more receptive to my First Amendment claims on re-sentencing in this case as Your Honor was during sentencing in my Assault Case. I do recall criticizing your judgment, but to be fair you can only pass judgment on the arguments presented to Your Honor. Mr. Olson's arguments were either weak or non-existant. Still I fear that nothing short of vacating my conviction in full could restore me to the state I was in before receiving ineffective counsel because any re-sentencing would likely be prejudiced by my history of self-representation and additional ammunition from the Ninth Circuit for the prosecutor that may not have been available to rebut my defense to the proposed conditio-



EXHIBIT *123*
PAGE *6* OF *20*



ns had ineffective counsel not forced me to have to appeal.

Finally, Mr. Olson was ineffective for failing to inquire as to Your Honor's justification for imposing the release conditions beyond the prior restraint aimed at censoring constitutionally protected activities. Articulating Your Honor's reasoning for the record is most necessary for making it reviewable in the Court of Appeals.

## SUMMARY OF INEFFECTIVE COUNSEL AT SENTENCING

I ask that Your Honor vacate my conviction in full or re-sentence me with downward departures for Acceptance of Responsibility, Victim Conduct, Diminished Capacity, and Single Instance without Deliberation. Starting with a Base Offense Level of 12 my Total Offense Level should be 2 with a Criminal History Category of III for a recommended guideline range of 0-6 months. If Your Honor finds that any of the appropriate departures I am asking for do not apply then I ask that you re-sentence me with all that do. Any excess time served should be credited to my Assault Case. Ideally this should result in my immediate release. I also ask that computer restrictions not be imposed.

In the event that this motion does not result in my immediate release, but even the slightest sentence reduction I bring to Your Honor's attention the fact that any time of incarceration is

E.C.F. 70

EXHIBIT  123
PAGE  7  OF  20

significant for the purposes of 2255. See U.S. v. Grammas (2004,
376 F.3d 433) citing Glover (531 U.S. at 203) "any amount of
actual jail time has Sixth Amendment significance".


GROUND FOR RELIEF 4: REASONABLE DEPARTURE OR VARIANCE


If necessary to assure an aggregate sentence equal to and not
exceeding the total length of consecutive sentences imposed in
both my Assault Case and Threat Case it may be necessary to group
them together for resentencing purposes. This is because BOP's
policies regarding credit for time served are somewhat hazy when
it comes to new offenses committed while in custody serving a se-
perate sentence that is vacated or reduced. Most of the confusion
in my research centers on the offense date of 4/21/14 for my Ass-
ault Case and whether or not time served prior to that can be
credited to my Assault Case if my Threat Case is vacated or the
sentence is reduced by more than 72 days.


According to 18 U.S.C. 3585(b) "A defendant shall be given
credit toward the service of a term of imprisonment for any time
he has spent in official detention prior to the date the sentence
commences". That suggests that giving me credit for time served
should not be a problem, but 3585(b) goes on to say "(1) as a re-
sult of the offense for which the sentence was imposed; that has
not been credited against another sentence." That last part sugg-
sts that time spent in custody prior to the commission of the of-

E.C.f 70          62

EXHIBIT 123
PAGE 8 OF 20

Perhaps Mr. James' conduct had a greater impact on my Assault Case than the one he represented me on. This is because I feel like he overstated the likelihood of success in the appeal so much so that I believed victory to be a near certainty and conducted myself under the assumption that it was only a matter of time until I got my rights back. This played a huge role in the Assault Case because he convinced me that seeking a modification of terms from the district court when my release conditions were being abused, was a bad idea. He said that I ran the risk of Your Honor modifying the terms just enough for me to use computers to look for work and obtain work in the computer industry without being able to run my websites. Had I been properly advised as to the current state of law in the Ninth Circuit I would have sought help from Your Honor despite that risk, but instead I let things get out of hand and lost my temper big time. I keep thinking back and I think it was more of a need to feel in greater control of my life that led me to do that than anything. Your Honor stated at my Assault Case sentencing that Your Honor wants me to work in the computer industry, so had I been properly advised of the likelihood of success in the Ninth Circuit I would most likely have gotten permission from Your Honor to use computers enough so that the dispute that led to the assault would never have happened. I also was not aware that judges can take it upon themselves to research case law and present arguments on behalf of the government that the government did not present in its brief, like the Ninth Circuit did in my case. This led me to greater believe

70

E.G. F. 70

EXHIBIT 123
PAGE 9 OF 20

[redacted]

success to be certain because Mr. James' brief was much better than Mr. Hoar's. When the Ninth Circuit cancelled oral arguments Mr. James said that was a good thing because they thought there was enought to decide the case based on briefs. I would not find out until March of this year that the Ninth Circuit ruled against me in December. Since December I have not spoken to Mr. James and he seems to be avoiding my phone calls. He went from a constant re-assuring voice, to non-existant, to bad news via his paralegal.

One thing that was a bit of a red flag was the Ninth Circuit's decision that "the conditions are 'not absolute,' but permit access subsequent to approval by Probation" because Mr. James had surprised me during a conversation during the fall of 2014 while meeting to discuss my Assault Case. The surprise was when I stated that I was not completely banned from computers, but was banned unless my P.O. approved of the access before hand. He told me not to say that because our position was that it was a complete ban. A better approach I think would be to attack the constitutionality of using release conditions created and typically used to protect the public from unlawful conduct as a means to suppress lawful conduct that some people wish was illegal.

Knowing what I know now I think I may have had better options had I just gotten out, turned the sites on, and appealled any violation as unconstitutional abuse of otherwise supposedly legal conditions.

E.G.F. 70

[redacted] 71 [redacted]

EXHIBIT 123
PAGE 10 OF 20



Now that I would need an intervention by the Supreme Court to run my business free of judicial harassment I feel that Mr. James was ineffective for failing to recommend to the person holding the keys to my business that payment be made to my hosting company with instructions to turn my sites back on. I say this because I know that the Supreme Court must be baited with issues of great public importance in order to make a case worth their time. After reading a recent Criminal Law Reporter I now believe that Mr. James' petition was denied. I can't help but think that had we raised the stakes a bit by making the issue not whether or not I would be free to run the sites at all, but whether or not the only American in a position to police the sites would be able to do that, then perhaps we may have had enough to bait the Supreme Court into intervening. In that way the Supreme Court can be thought of a lot like politicians and the news media both of which were easily baited into giving several of my sites lots of free advertising. Since the demise of my sites my voice with the media has gone with them. No sites, no story, and apparantly no Supreme Court case.

In retrospect I would have been better off turning my sites on while at the halfway house, but the person holding the keys decided not to help with them without approval of an attorney. It was that betrayal and outright sabotage by those closest to me that was the primary source of rage in my life when I assaulted the staff member. Had my decision to go back into custody in protest after Rene Worthey and NWRRC began abusing my conditions to the point that I could not even look for work been able to be carried out... C / C 70.



EXHIBIT 123
PAGE 11 OF 20



without escaping as it should have been who knows? Maybe I would

be home and Your Honor would have seen the wisdom in not impriso-

ning the only person capable of addressing complaints regarding

the sites once they were up and running on an offshore server wi-

th either an automated payment system or after being paid enough to

stay running for however long Your Honor could lock me up for.

Maybe then things would have been different.


At the very least Mr. James appears to be the latest in a lo-

ng list of people telling me what they think I need to hear not

to freak out and do something, instead of telling me what I real-

ly need to hear, which is up to date and reliable information ab-

out all aspects of my business, criminal cases, and truthful ans-

wers to any questions I have. While spending six weeks in the SHU

at USP Victorville I read "Intelligence in War" by John Keegan a-

nd I remembered empathizing with Lord Nelson in his effort to lo-

cate the French fleet in 1798 only to be fed a combination of fa-

lse and out of date information before finally cornering them at

Alexandria. Like Lord Nelson a criminal defendant can't effectiv-

ely plan and execute a criminal defense without up to date infor-

mation on his enemies' activities. Mr. James was to provide me w-

ith that information and did not do so, a trait shared by Per Ol-

son and Thomas Price.


For the aformentioned reasons I ask that Your Honor vacate my

conviction on the grounds of ineffective assistance of counsel on

appeal.

E.C.f. 70

EXHIBIT _123_
PAGE _12_ OF _20_

the following Aggravating Truths that don't apply directly to my ineffective counsel at plea, sentencing, appeal, or other arguments. I offer them only as arguments in favor 's re-sentencings at the bottom end of the guideline range and to further document this farce and mockery of justice.

## AGGRAVATING TRUTH 1: RUSH JOB

If Your Honor recalls my sentencing hearing was delayed due to Mr. Olson not being ready on time despite having 10 weeks to prepare. Even with the delay his progress was awful. He only really seemed to work at arguing the intent to carry out threat enhancement and at times suggested there was so little at stake by comparison to what he usually represents that he didn't anticipate much of a hearing. As I've outlined before many of his arguments are incomplete. I contribute a lot of that to him rushing my case. I considered firing him, but was without legal resources to second guess him and he said that he thought he could get me out, so I didn't want to go through the process of having a new lawyer learn the case.

## AGGRAVATING TRUTH 2: LEADING ME BLIND

Like my Dad always said "just because you are paranoid does not mean they are not really out to get you". Since the beginning of my pre-trial confinement it seems like my counsel has been

E.C.f. 70

working with the government to cut me off from society and any information I could use to second guess them. For starters the day after my arrest on state charges Mr. Demer fabricated some theory that I might be able to destroy digital evidence if allowed to use the phone. As a result I could not use the jail phone for five months unless a deputy used the deputy only phone to call my attorney for me. By attorney I mean only lawyers already appointed to represent me by the court. My first effort to get a release hearing resulted in my then lawyer Kami White telling me she didn't want to get one because Mr. Demer didn't think it would be a good idea and my release would probably result in more charges. All other attorneys I had during the pre-trial stage seemed more interested in handling my case in the way that created the least amount of work for them instead of the way that was best for me. It seemed like they did not want me to get out where I could speak out. Then once in federal custody I was moved to the Columbia County Jail where as I mentioned earlier there really is no federal law library, which forced me to rely on Mr. Olson for advice and right before that his advice was for me to take a global resolution offer for 30 months in which I would be subject to computer restrictions and agree to abandon my business. Had I followed his advice I would have gotten more time and would not have been able to access any legal information on computers to second guess his performance.

E.C.F. 70

81

EXHIBIT 123
PAGE 4 OF 20

## AGGRAVATING TRUTH 3: LIARS AND QUITTERS

Before Per Olson, Thomas Price at the Federal Public Defender (FPD) was appointed to represent me. At that time my primary web server was still running, but due to the hosting company failing to provide me with an automated payment solution despite multiple requests, I had decided to change hosts to one that did offer automated payments and my migration to the new host had not been finalized when I was arrested. As a result I was only paid up through the month I was arrested and I knew that I would need a third party to transfer funds for me until my release to assure that basic services be provided indefinitely. Since I was frivolously banned from the jail phone for the obvious purpose of preventing me from doing that very thing I instructed Mr. Price to pass login information and payment instructions to that third party. I pitched it as an evidence preservation issue and Mr. Price agreed that evidence needed to be preserved, but only wanted it kept without keeping the server on. That was unacceptable to me and Mr. Price agreed to pass the information, but he also said that he would have to recommend to the third party that the instructions not be followed. I told him not to do that because that third party would likely become paralyzed with fear and unable to operate optimally if given such information. He then agreed not to make the recommendation.

E.C.F. 70

82

EXHIBIT _123_
PAGE _15_ OF _20_

Your Honor might wonder why anyone in my position would d-
isregard his lawyer like that and the answer is that I did my
homework. As a result I had long before identified frivolous
legal action as a liability due to American courts being unrel-
iable when it comes to protecting the constitutional rights of
citizens whether it be in a civil or criminal action. I knew
that lawyers were good at convincing lower courts to side with
them at least initially and the high likelihood of a court order-
er being issued in an effort to circumvent site policies someday-
ay. In that event I concluded that any lawyer representing me
would most likely recommend that the order be complied with
and possibly the sites shut down until the court could hear the
matter. Rather than face months or years of lost revenue I rea-
lized that policies would have to be put in place requiring any
court order to first adhere to site policies in order to be ho-
nored and that the offshore nature of the operation would have
to be utilized to enforce these policies by making adherence to
them a condition for the websites to be policed at all. Only
then could the free speech rights of users be properly protect-
ed from judicial censorship in cases in which the harmful truths
they expose would be otherwise censored by clever legal maneuve-
ring. These policies were backed by the creation of a program
called ACSERP (Anti-Censorship Search Engine Re-habilitation Pr-
ogram) that would flag pages removed from search engines for
legal reasons and cause them to be re-indexed in a continuous
loop. ACSERP effectively made American courts obsolete as a me-

Ei.Ci.f. 70                    83

EXHIBIT _123_
PAGE _16_ OF _20_

ans to permanently remove content from the internet. My stalker
was one of the test subjects for ACSERP whose tireless attempts
to remove links to her STD report were essential to proving its
effectiveness. As a result I can conclusively say that any law-
yer claiming to be able to permanently remove links to any of
my sites to be a false advertiser that most likely doesn't even
know how wrong he/she is. It also means that rulings like one
made recently by the European High Court requiring search engi-
nes to remove links to private information were obsolete before
ever being issued. This means that the right to speak online is
safe in the hands of users whether they are talking about STDs
or any other topic like they can on my post anything website
NoLimitList.com. Such policies would be rendered useless if I
were to completely abandon my business just because a judge tells me to
seek permission before using a computer or directing a third
party to use one for me. Any such order would not be in compli-
ance with site policies at all and could not be followed witho-
ut first violating my own policies. Therefore even though Your
Honor's laws say that Your Honor has the right to tell me not
to use a computer I'm not capable of honoring Your Honor's
claim to that alleged right. Therefore the best way to deter
any aggressor whether it be a deranged stalker, disgruntled
subject of an article, civil litigator, policeman, prosecutor,
judge, etc. from pursuing me in the courts is to configure mys-
elf in such a way that pursuits of such nature would only make
matters worse because locking me up for any reason that does

E. C. if. 70

84

EXHIBIT 1 3 7
PAGE 17 OF 20

not result in the downing of the sites would only result in the
content sought to be removed by the aggressor to be kept up in-
definitely as a result of their efforts unless removed by the
author, with the person responsible for issuing or carrying out
any order to lock me up or otherwise interfere with my ability
to run my buisiness blamed publicly for any allegations of emo-
tional distress from the general public resulting from their
abuse of discretion.

Obviously I was not surprised when Mr. Price recommended
that the sites be shut down, which is why I overruled him on
that matter. I knew that any lawyer would have to be forced to
defend me with the sites up to best protect my interests. With
automation unavailable as a means to keep the primary server
running I was relieved when told by the third party that Mr.
Price had transferred the information, the hosting company agr-
eed to host the sites despite the charges, and that payment wo-
uld be made. Unfortunately the sites went down and I was given
excuses why the payment was not made only to be told that it w-
as due to Mr. Price recommending against it. Whatever he said
was good enought to keep my third party from following instruc-
tions to ignore Mr. Price and subsequent lawyers.

When confronted with this information Mr. Price reminded me
of his recommendation and tried to trick me into thinking that
I approved of him communicating it to my third party. At that
point I felt I could no longer trust Mr. Price and shortly a-

E. C. F. 70

EXHIBIT 123
PAGE 18 OF 20

fter that he withdrew from the case citing a conflict of intere-
st. He said that someone else in my discovery had been represent-
ed by the FPD at one point. I doubt that because when my invest-
igator Mark Robertson did background checks on the people invol-
ved in the case no federal charges came up. I can't think of any
reason why the FPD would have ever represented anyone else invo-
lved in the case. My state attorney at the time Stuart Sugarman
blamed my attitude for Mr. Price's departure, so I think Mr. Pr-
ice lied just to get rid of me without a big argument because
our relationship was damaged beyond repair.

To add insult to this injury Mr. Price and Mr. Sugarman appea-
red to be trying to get me declared mentally incompetent to aid
and assist them. Apparently one thing I didn't factor into my
risk management plan was the tendency of attorneys to think any-
one that ignores their advice must be crazy. Even after being
declared sane Mr. Sugarman kept wondering how that was possible.
The answer to that is that I have always been competent to aid
and assist in defending myself in the ways that I wish to be
defended.

Mr. Price's actions have prejudiced me to this day by putting
me at a disadvantage in which any judge disapproving of the sit-
es can feel free to give me more severe sentences with the beli-
ef that doing so will keep them down longer and if they are up,
might keep them down long enough for me to have to seek their

E.C.F. 70

EXHIBIT 123
PAGE 19 OF 20

approval to turn them back on. This will no doubt only embolden
my enemies further in the future rather than break their spirits
as this case could have otherwise. After all if even a federal
judge is powerless to police the internet then surely no common
man can. At the time of my arrest I had a flow chart in my head
of every control that the government might seek to impose and
never considered computer restrictions much of a liability main-
ly because buying a computer is not like buying beer, visiting a
pharmacy, or buying a gun because I do not have to show ID, obt-
ain a prescription, or pass a background check. All I have to do
is sneak off long enought to buy a computer and restart the sites
to shatter the illusion that Your Honor has any say in the matter
. I won't make the same mistake twice and those sites will stay
up as long as I stay locked up, most likely with the phone number
of whichever government agency or employee I consider most respo-
nsible listed on the sites as the only place to complain. The
best thing for all involved would be for BOP to send me back to
the halfway house where I be left free to find work in my field
without my probation officer sabotaging my efforts.
That means Rene Worthey will have to keep her mouth shut around
potential employers. Otherwise I will probably decide that I am
better off in the long run turning the sites on. It also means
people like Kevin Demer, Sean Hoar, and Jonathan Haub will have
to do a better job exercising their prosecutorial discretion in
the future.

E.C.f 70

EXHIBIT _123_
PAGE _20_ OF _70_

Mr. Price was ineffective for sacraficing my best leverage
in a manner that continues to reward the government for locking
me up at a time where I am still just one easy payment away from
denying them the fruits of their labor, and still forced to rely
on a traitor that chose to require the court's approval as a
condition of cooperation, and because Mr. Price's investigators
incurred huge service charges making that one payment too expen-
sive for me at the moment. I can assure Your Honor that I will
have enough money next time I get out so that I can replace that
third party with machines or a lump sum payment that is enough
to keep them running past the longest amount of time that you
can lock me up for.


AGGRAVATING TRUTH 4: MR. OLSON"S DEMEANOR


Mr. Olson's courtroom demeanor was nothing short of awful. I
have since learned that he picked up or was handed a piece of
paper at sentencing and was seen shaking in fear or possibly an-
ger. Either way his head just was not in the game.


AGGRAVATING TRUTH 5: VICTIM"S ADVOCATES


Mr. Olson agreed to move the time of the sentencing hearing w-
ithout my permission so that my stalker could be there. As a re-
sult my Dad could not make it. When asked why he said "to be ni-
ce". Well the problem with that is that his job is not to be ni-

E.C.F. 70

88

PP-A0304
AUG 11
**U.S. DEPARTMENT OF JUSTICE**

**DISCIPLINE HEARING OFFICER REPORT** CDFRM

EXHIBIT 124
INMATE COPY PAGE 1 OF 5

**FEDERAL BUREAU OF PRISONS**

| Institution: | USP Victorville | | Incident Report Number: | | 2770867 |
|---|---|---|---|---|---|
| NAME OF INMATE: | SULLIVAN, Cyrus | | REG NO.: | 74918-065 | UNIT: | 4A |
| Date of Incident Report: | 10-09-2015@9:00AM | | Offense Code: | | 298 *most like 203* |
| Date of Incident: | 10-09-2015@7:00AM | | | | |
| Summary of Charges: | Interfering with Staff in the Performance of Duties, *most like Threatening Another Person* | | | | |

## I. NOTICE OF CHARGE(S)

A. Advanced written notice of charge (copy of Incident Report) was given to inmate on

(date) 10-10-2015 at (time) 8:55AM (by staff member) C. Johnson, Lieutenant

B. The DHO Hearing was held on (date) 10-21-2015 at (time) 12:55PM

C. The inmate was advised of the rights before the DHO by (staff member):

V. Torres, Unit Team on (date) 10-15-2015@11:00AM and a copy of the advisement of rights form is attached.

## II. STAFF REPRESENTATIVE

| A. Inmate waived right to staff representative. | | Yes: | X | No: | |
|---|---|---|---|---|---|
| B. Inmate requested staff representative and | | N/A | | appeared. | |

C. Requested staff representative declined or could not appear but inmate was advised of option to postpone hearing to obtain another staff representative with the result that: N/A

| D. Staff Representative | N/A | was appointed |
|---|---|---|

## III. PRESENTATION OF EVIDENCE

| A. Inmate admits | X | Denies | | the charge(s). |
|---|---|---|---|---|

B. Summary of Inmate Statement:
Inmate Cyrus SULLIVAN, Register Number 74918-065, stated, 'I have the right to see the doctor, to receive the level of medical care I deserve, and to publish true facts about her job performance. I gave her the opportunity to improve her performance. It's not like threatening bodily harm at all. The administrative remedy process takes time. No, I never talked to medical staff at mainline. I thought the problem would resolve itself."

C. Witnesses: N/A

| 1. The inmate requested witness(es). | | Yes: | | No: | X |
|---|---|---|---|---|---|

2. The following persons were called as witnesses at this hearing and appeared:
N/A

3. A summary of the testimony of each witness is attached.

N/A

1

PP-A0304
AUG 11
U.S. DEPARTMENT OF JUSTICE

**DISCIPLINE HEARING OFFICER REPORT**   CDFRM

INMATE COPY   EXHIBIT ___124___
PAGE ___2___ OF ___5___

FEDERAL BUREAU OF PRISONS

| Name of Inmate: | SULLIVAN, Cyrus | Reg. No.: | 74918-065 | Hearing Date: | 10-21-2015 |
|---|---|---|---|---|---|

4. The following persons requested were not called for the reason(s) given:
N/A

| 5. Unavailable witnesses were requested to submit written statements and those statements received were considered. | Yes | | No | | N/A | X |
|---|---|---|---|---|---|---|

D. Documentary Evidence: In addition to the Incident Report and Investigation, the DHO considered the following documents:
Written Statement provided by inmate

E. Confidential information was used by DHO in support of his findings, but was not revealed to the inmate.  The confidential information was documented in a separate report.  The confidential information has been (confidential informants have been) determined to be reliable because:

## IV. FINDINGS OF THE DHO

| X | A. The act was committed as charged. | |
|---|---|---|
| | B. The following act was committed: | |
| | C. No prohibited act was committed:   Expunge according to Inmate Discipline PS. | |

BP-A0304
AUG 11
U.S. DEPARTMENT OF JUSTICE

DISCIPLINE HEARING OFFICER REPORT   CDFRM
INMATE COPY   EXHIBIT  124
PAGE  3   OF  5

FEDERAL BUREAU OF PRISONS

---

**V. SPECIFIC EVIDENCE RELIED ON TO SUPPORT FINDINGS (Physical evidence, observations, written documents, etc.**

The inmate's due process rights were read and reviewed by the DHO to the inmate. The DHO confirmed the inmate received a copy of his incident report, did not want to call any witnesses, and did not want a staff representative. The inmate submitted a written statement for the DHO's consideration. The inmate understood his due process rights, and was ready to proceed with the DHO Hearing.

The DHO found inmate Cyrus SULLIVAN, Register Number 74918-065, committed the prohibited act of Interfering with Staff in the Performance of Duties, in violation of Code 298, *most like Threatening Another Person, Code 203*. The DHO relied upon the reporting officer's report which indicated on October 9. 2015, at approximately 7:00 a.m., while the reporting officer was working at the sick call window, inmate SULLIVAN, Cyrus, Register Number 74918-065, came to the line with a stack of unauthorized sick call slips. When the reporting officer asked him where he got them, he became very agitated and stated harshly he was given the papers. The longer he was at the window, the angrier he got. The more the reporting officer inquired, the more argumentative he became. Just before inmate SULLIVAN left the window, he stated, "You just wait until your profile shows up on my computer." The reporting officer replied, "Okay." SULLIVAN then repeated, "You just wait until your profile shows up on my computer. You'll be sorry!" The inmate left the window without further incident. The Operations Lieutenant was notified.

The DHO considered the Written Statement inmate SULLIVAN submitted at the time of his DHO hearing. In the written statement, inmate SULLIVAN wrote, *"DHO, I have every right to publish true facts on my website NoLimitList.com documenting PA-C B. Wolverton's neglectful medical malpractices. I also have every right to inform her of my intentions and give her an opportunity to improve her future image before her current image becomes public. In my nearly 9 months here I have yet to see a doctor despite countless requests to several PA.s including mine, Wolverton. The alleged 'unauthorized sick call slips' contained six things I need to be seen for, most or all of which Wolverton has previously been made aware of, but instead of getting me a doctor's appointment as she should, she found another excuse. This time she didn't even process the slips claiming that I have too many. She is the only P.A. I've talked to that will not process more than one slip at a time. As a result of that and previous neglect I have yet to be seen by a doctor for chronic neck pain, chronic acne, dental problems, medication mix-ups, possible foot fracture, nerve damage in my left hand, and a painful right shoulder with limited mobility. I've also heard rumors that she is an alcoholic and her alcoholism contributes significantly to her incompetence. I have every right to publish an accurate account of my experience, that I've heard that other people have similar problems with her, and properly cited rumors when I am released next year. Before my web server went down shortly after my arrest, sites in my network frequently ranked at the top of Google for searches for their subjects. They did so well that I was able to gain employment as a search engine optimizer and charged good money to remove results from search engines linking to my websites. I even wrote a program that got results previously removed by the search engines for legal reasons back in. That effectively made your government obsolete as a means of permanently removing content from the web. Odds are any profile of Wolverton detailing an accurate review of her job performance and reputation as a lush will make her look like an incompetent train wreck for the rest of her life. I care about my health as I'm sure she cares about her reputation. She should be grateful for the opportunity I am giving her to improve her performance and avoid what would otherwise be great devastation to her professional as well as personal reputation. Who knows? Maybe if she improves enough I'll leave her off the site entirely. In closing I am aware of complaint procedures in the BOP. I also know that my system is superior because it has consequences the administration of which does not depend on your system. Your system protects you and mine does not, but I still am more fair in administering it. Sincerely, Cyrus Sullivan, President, NoLimitList.com, webmaster@nolimilist.com."* The DHO considered the written statement provided by inmate SULLIVAN as further evidence he was threatening to slander the reporting officer and

3

BP-A0304
AUG 11
U.S. DEPARTMENT OF JUSTICE

**DISCIPLINE HEARING OFFICER REPORT**  CDFRM

EXHIBIT 124

INMATE COPY  PAGE 4 OF 5  FEDERAL BUREAU OF PRISONS

intended to harm her personally and professionally by publishing "rumors" on a website administered by him. The DHO considered the nature of the prohibited act. Inmate SULLIVAN has a serious history of assaultive behavior towards staff both at FCC Victorville and while in a community confinement reentry facility. A review of SULLIVAN's computerized disciplinary history revealed he was previously sanctioned for Code 224, Assault (Staff) once in April 2014 and twice in July 2015. The DHO also considered inmate SULLIVAN's prior criminal history of threatening communication involving his posting of false information about private citizens on his website. SULLIVAN refused to remove the false information unless he was paid to do so. Based upon this information, the DHO perceived inmate SULLIVAN's threat to post malicious information about the reporting officer on the website was credible and potentially harmful to the reporting officer's personal well-being and career.

The DHO relied upon inmate SULLIVAN's statement at the DHO hearing in which he admitted he threatened to post information (on his website) about the reporting officer's job performance and that by threatening her, he was giving her an opportunity to improve. SULLIVAN acknowledged in his statement at the final hearing and in his written statement, that he failed to utilize the Administrative Remedy process to address his concerns about the medical care he was receiving at this facility for a number of "chronic" issues. Based upon correctional experience, the DHO was not convinced any of the concerns identified by inmate SULLIVAN were critical or potentially fatal. Moreover, the DHO relied upon inmate SULLIVAN's statement he had the right to publish "true facts" about the reporting officer. However, inmate SULLIVAN admitted in his written statement he was relying on "rumors" concerning the reporting officer and clearly stated his intention to publish the "rumors".

The DHO found it important to note, while informing inmate SULLIVAN of the sanctions imposed, he made similar threats toward the DHO. Inmate SULLIVAN stated, "That's not going to make you look good on my website. Going on the 'priority subject' list." Additionally, as inmate SULLIVAN was being escorted out of the hearing he further stated, "Have a nice day, bitch!"

Based upon the greater weight of the evidence, the DHO was convinced inmate Cyrus SULLIVAN, Register Number 74918-065, was Interfering with Staff in the Performance of Duties, in violation of Code 298, *most like Threatening Person, Code 203.*

| VI. SANCTION OR ACTION TAKEN | | | |
|---|---|---|---|
| Offense Severity: | High | SGT Available: | Not eligible – PLRA |

20 days, Disallowed Good Conduct Time
4 months, Loss of Commissary privilege
4 months, MP3 Player restriction

| VII. REASON FOR SANCTION OR ACTION TAKEN |
|---|

Any action on the part of any inmate to interfere with staff by threatening to publicly slander their professional reputation by maliciously posting "rumors" seriously jeopardizes the security of the facility and the safety of others. The disallowance of good conduct time was imposed based on the severity of the offense, and the inmate's sentence commitment. Other sanctions were given to serve as a punishment for the inmate's inappropriate behavior, and to affect the inmate's future behavior.

BP-A0304                    **DISCIPLINE HEARING OFFICER REPORT**    CDFRM
AUG 11                              INMATE COPY    EXHIBIT    *124*
U.S. DEPARTMENT OF JUSTICE          PAGE  *5*  OF *5*        FEDERAL BUREAU OF PRISONS

| VIII. APPEAL RIGHTS: The inmate has been advised of the findings, specific evidence relied on, action and reasons for the action. The inmate has been advised of his right to appeal this action within 20 calendar days under the Administrative Remedy Procedure. A copy of this report has been given to the inmate. | | | | | |
|---|---|---|---|---|---|
| | Yes | X | No | | |

**IX. DISCIPLINE HEARING OFFICER**

| Printed Name | Signature | Date |
|---|---|---|
| D. Elliott, Disciplinary Hearing Officer | *D. Elliott* | 11-17-2015 |
| Scanned and Emailed: | *Elliott* | 11-17-2015 |
| Delivered to Inmate: (via institutional mail) *Elliott* | DATE: 11-17-2015 | TIME: 6:59 AM |

*Note: Delivery of this incident report was delayed due to the increased volume of hearings conducted during this period. As a result, the final report was not completed within 15 working days. This delay will not hinder the inmate's due process or right to appeal the DHO's decision. At the final hearing, the inmate was advised of his right to appeal by submitting a BP-10

Prescribed by P5270                                    Replaces BP-S304 (52) JAN 88

EXHIBIT 125
PAGE 1 OF 3

the plea hearing as proof that I understood the elements.
Those statements were viewed as harmless, just like in the
plea agreement and say nothing of intending to make a serio-
us threat. Both show how sneaky Mr. Hoar is better than how
well I understood the charge.

     Page 8 also states out of context that Geoff Darling
would be targeted, as if I meant physically targeted. I
meant that he would be targeted for criticism and ridicule
on the internet at http://nolimitlist.com/rantrave/governme-
nt/police and made good on that threat with a posting titled
something like "ODOJ Chief Investigator Geoff Darling is
Incompetent".

     Page 9 gets into an issue already discussed in my memo
(DM, p. 25-36). When I answered "no" after Your Honor asked
me if I wanted to dispute anything Mr. Hoar had just said.
I maintain my position that declining to dispute a statement
is not the same as truly understanding a statement and unde-
rstanding must be verified to comply with Rule 11. I did
answer "yes" to a later question regarding understanding
because I thought I understood the elements as described in
the Superseding Information, which had no specific intent
element.

E. C. F. 91                    6

EXHIBIT _125_
PAGE _2_ OF _3_

to a jury wanting to convict me as a way to punish me for
the websites. Information similar to statements in his
declaration saying I would be facing "a guideline sentence
of at least six years" for the 875(b) charge. That might
initially make pleading to 875(c) look reasonable, but it
really was not due to the ridiculousness of the 875(b)
charge as documented in my memo (DM, p. 11-13). As a result
of his misleading advice and overall attitude I pled guilty
to a crime I did not commit rather than go to trial with
an incompetent lawyer. I again ask that Your Honor vacate
my conviction for the reasons described in my memo (DM, p.
15-36).

    I noticed that the Government used Padilla v. Kentucky
(559 U.S. 536) to cite the "high bar" that must be surmount-
ed in order to find that a lawyer was constitutionally inef-
fective. When reading Padilla I also found grounds to decla-
re a lawyer ineffective at the plea stage that has nothing
to do with actual guilt or innocence. Those grounds were
improper advice as to the consequences of pleading guilty.
In Padilla his lawyer failed to advise him of the direct
consequence that he would be deported if convicted. The
deportation had nothing to do with guilt or innocence of
the charge, but whether or not he would have pled guilty
had he known that he would be deported as the result of
a seperate proceeding initiated after his conviction. Kind
of like how Mr. Olson promised me that if I pled guilty I
would have a competent lawyer (him) fighting for my right

E. C. F. 91

EXHIBIT 125
PAGE 3 OF 3

to engage in free speech on the internet without the interference of a probation officer. Had I known that he would throw in the towel and side with the prosecution on that matter I would not have plead guilty . I would have asked for a new lawyer with a better attitude capable of seeing the facts accurately like I do to take the case to trial. Like Padilla, Mr. Olson knew that "[p]reserving [my] right to [use computers was] more important to [me] than any potential jail sentence" Padilla quoting Calcano-Martinez v. INS (533 U.S. 348). Like Padilla's counsel Mr. Olson provided "false assurance" that I would have competent counsel fighting for my rights at sentencing. Had Mr. Olson properly advised me of "the advantages and disadvantages of the plea agreement", Padilla quoting Libretti v. U.S. (516 U.S. 29), with the advantages being reduced exposure to prison time due to dismissal of more serious charges and the disadvantage of having no one to fight for rights that I care about more than my physical freedom rejecting the plea offer would "have been rational under the circumstances" Padilla quoting Roe v. Flores-Ortega (528 U.S. 420). Mr. Olson failed to advise me of his true intentions and in doing so persuaded me to plead guilty only to be left to the "mercies of incompetent counsel", Padilla quoting Richardson (397 U.S. at 771 ), at sentencing. I again ask that my conviction be vacated.

Response to: IV. Claim of Incompetency at Sentencing



EXHIBIT 126
PAGE 1 OF 1

Enclosed is a copy of pages 14-19 of my reply to the Government's Response to my 2255, a recent case proving that my sites don't violate the cyberstalking law, and proof of my injuries. As I explained to you on Sunday 12/20 I am including them to get you caught up on the current state of affairs, to assure you that my websites are legal, and to prove I was injured.

As you can see the probation officer, prosecutor, and judge will have two choices if my halfway house is not increased or if it is increased and I still can't find work in my field. Those choices will be not to interfere with the operation of my buisness or to interfere and accept responsibility for any collateral consequences if they choose to re-incarcerate me. Those consequences will include the complete lack of ability to administratively remove content from the sites, users being directed to take their gripes to the government official most responsible for the problem, and other surprises that I don't want to talk about through the mail.

As the enclosed case shows my sites would fit the defenition of conduct the prosecution of which would be abuse of the cyberstalking law. That is because you can't criminalize free speech just because the speech intentionally causes emotional distress.

Since my July beating you have been obligated to turn the sites back on per your promise should any harm befall me in here and now even though it has you have not honored your word with no real explanation. In the past you have cited the frivolous stalking charge, BOP rules against inmates running businesses, supervised release conditions, and your tastes. I DO NOT CARE what any of your excuses are. All I care about is getting my sites back up before I go home so that once home I won't have to violate my release conditions to get them back up.

Nothing mentioned in this letter or the enclosed material are ideas. An idea is defined as "a mental conception; a thought". These are policies. A policy is defined as "a method or course of action followed by a government, an individual, etc." Now that you know the difference between policies and ideas please do not refer to my policies as ideas anymore. Keep your promise and help me enforce my policies by turning the server back on, using my press release accounts to distribute announcements, and create support tickets whenever you notice that the sites are down. Those are all things that you know how to do.

Thank you for your cooperation.

12/21/15

PS Remember that the letter to

EXHIBIT _122_
PARAGE _1_ OF _2_

To: ▓▓▓▓▓▓▓▓▓▓▓▓
From: Cyrus Sullivan
Date: 1/4/2016
Subject: Breach of Contract Notification

Dear ▓▓▓▓▓▓▓▓▓▓

 I am writing to formally inform you that you are in brea-
ch of contract and I am now within my rights to take legal
action against you. To prove a breach of contract claim I
must prove the four elements of formation, performance, brea-
ch, and damages (see Exhibit 1). I can prove each of those
elements and oral contracts are valid.

 1) Formation: In August of 2013 you entered into volunta-
rily and of your own free will, an oral contract with me in
which you promised to turn my web server back on if anyone
were to intentionally inflict bodily injury on me while
incarcerated. In return I had previously promised you 50% of
all advertising revenue and sales revenue from the No Limit
List Corporate Advocacy Program ("NLLCAP") for all user gene-
rated content ("UGC") created during any period for which I
was incarcerated as long as you do all in your power to keep
the server running properly.  To keep the server running pro-
perly all that was required of you was a one time payment of
$1,750 to EuroVPS to cover the re-start and services rendered
as a result of your failure to transfer funds immediately
following my arrest, plus a monthly transfer of about $105
from my ▓▓▓▓▓ account. The ▓▓▓▓▓ account was to be fully
funded by advertising revenue. In addition you may have been
required to create technical support tickets in the events of
service outages with the hosting company. Such outages were
to be detected by visiting at least one website hosted on th-
at server at least once a week to make sure that it was oper-
ating. Total time estimated for the job was one and certainly
not more than two hours per month for which the 50% revenue
share was a more than generous offer.

 2) Performance: On July 29, 2015 I was beaten and tortur-
ed by correctional officers in the special housing unit (SHU)
at USP Victorville. You were informed of the incident in Aug-
ust, stated that you believed my story in November, and rece-
ived written proof of the incident in late December.

 3) Breach: On 12/25/2015 following months of stonewalling
on your part you attempted to convince me that your agreement
was only to "think about it" when in fact it was not. When
confronted about that lie you stated "I changed my mind" as
your real reason. "I changed my mind" was never an option for
you under our agreement for any reason. Whether you want to
or not you have an obligation to fulfill.

 4) Damages: My debt to EuroVPS remains at $1,750. Due to
uncertaintly as to traffic due to an uncertain search engine
ranking recovery timeline exact advertising and NLLCAP losses

EXHIBIT __127__
PAGE __2__ OF __2__

are unknown at this time. Losses can only be calculated once
the server is back up and after the sites have been online
for as much time as I remain locked up from the time in which
you were first obligated to honor your part of the contract.
It should also be noted that due to the high profile nature
of the sites the viral marketing value of turning the sites
back on from jail/prison may never be known, so I will have
to use the value of turning them on once I get out to estima-
te how much advertising and NLLCAP revenue would most likely
result from such a promotion.

    I respectfully request that you honor your end of this
contract by turning my web server back on immediately. Do th-
at and I will agree not to sue for damages resulting from
your breach of contract so far.

    I know that this letter must come as a shock to you.
Surely you must think that being a mother puts you above the
law when it comes to contracts with your son, but fortunately
the law does not consider family relation relevant to contra-
ct validity. I hope that this will be a learning experience
for you and that you will not neglect future obligations
just because you do not feel like fulfilling them.

Sincerely,

Cyrus Sullivan

2

EXHIBIT 128

PAGE 1 OF 2

not apply. Thus, even if Olson had made the single instance argument under USSG §

2A6.1(b)(6), I would have rejected it because I applied the two-level enhancement under

subdivision (b)(2). See United States v. Anderson, 474 F. App'x 672, 673 (9th Cir. 2012)

(defendant's request for decrease under "single threat" adjustment of USSG § 2A6.1(b)(6), was

precluded by determination that there were multiple threats).

Finally, Defendant argues that Olson was ineffective in regard to his supervised release

conditions requiring Defendant to obtain prior written approval from a United States Probation

Officer before using or possessing a computer or accessing any on-line computer. He argues that

Olson should have argued that the restrictions violated his First Amendment rights, were

overbroad, and unjustified by the record.

Olson addressed supervised release computer restrictions in his Sentencing

Memorandum, advocating for Defendant's access to computers, the Internet, and Defendant's

websites. ECF 51/Attach. 2 to Gov't Resp. at 20-21. At the sentencing hearing, Olson again

discussed the conditions which were recommended in the PSR. ECF 64/Attach. 8 to Gov't Resp.

at 40-41. In December 2014, the Ninth Circuit rejected Defendant's argument that these

restrictions were unconstitutional, expressly noting that the use of a computer and the Internet

were essential to the commission of the crime. United States v. Sullivan, No. 13-30207, 588 F.

App'x 631 (9th Cir. 2014), cert. denied, 135 S. Ct. 1877 (2015). Accordingly, any failure by

Olson in not expressly raising these issues at sentencing caused no prejudice.

III. Certificate of Appealability

The district court should grant an application for a certificate of appealability only if the

petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. §

26 - OPINION & ORDER

E.C.F. 92

EXHIBIT _128_
PAGE _2_ OF _2_

2253(c)(3).  The Court concludes Defendant has failed to make a "substantial showing of the denial of a constitutional right" on all issues except for whether Olson was ineffective in advising Defendant to plead guilty to the Superseding Information which did not expressly recite the element of the crime regarding the intent to convey a threat.  Thus, on this record the Court issues a certificate of appealability only as to the specified issue and declines to issue a certificate on any other issues.

CONCLUSION

Defendant's Motion to Vacate or Correct Sentence under 28 U.S.C. § 2255 [69] is denied.

IT IS SO ORDERED.

Dated this _6_ day of _January_, _2016_

_Marco Hernandez_
Marco A. Hernandez
United States District Judge

27 - OPINION & ORDER

E.C.F. 92

EXHIBIT _129_
PAGE _1_ OF _3_

Error of Law: Failure to Consider Cronic Claim


When rejecting my arguments in Ground for Relief 3:
Ineffective Counsel at Sentencing, under Inappropriate
Release Conditions, The Court failed to address my claim
under U.S. v. Cronic (466 U.S. 648) that Mr. Olson failed
to "subject the prosecution's case to meaningful adversar-
ial testing" at the sentencing hearing by stating "I don't
want to take the position that Mr. Sullivan should just be
able to do whatever he wants on the internet, on computers
" (Sentencing Hearing Transcript, "SHT", p. 40).


The Court based its rejection of Ground for Relief 3
in part on Mr. Olson's brief advocacy against the conditi-
ons in his sentencing memorandum (00, p. 26) which did co-
ntain an overbreadth argument as well as the fact that my
income would be "tremendously impacted". The Court however
is silent on the fact that Mr. Olson torpedoed those argu-
ments at the sentencing hearing. His performance was so
bad  that The Government tried to use it as grounds to
dismiss my appeal for failing to preserve the objection.
Bronson James credited my personal objection for preservi-
ng that argument both to me in person and to the Ninth Cir-
cuit in his brief (Appelate Brief, "AB", p. 9-10). In my
reply to the Government's Response (Defendant's Final Repl-
y to the Government's Response, "My Reply") I pointed out
that the Government never offered any constructive counter

E.C.F. 93                      8

EXHIBIT 12 9
PAGE 2 OF 3

argument against my Cronic claim (My Reply, p.14-16).and
presented an exhibit explaining a correct application of
Cronic (My Reply, Exhibit 2). If Mr. Olson's statement at
the sentencing hearing does not qualify as IAC under Cronic
then it would be difficult to say what would. Perhaps The
Court would like to articulate for the record what part of
"I don't want to take the position that Mr. Sullivan should
just be able to do whatever he wants on the internet, with
computers" is adversarial?

The other basis for The Court's rejection of Ground for
Relief 3 when it comes to Inappropriate Release Conditions
was that that the Ninth Circuit technically made them legal
by erroneously declaring them constitutional and therefore
failing to raise those issues caused no prejudice (00, p.
26). The problem with The Court's opinion is that in order to
grant IAC relief under Cronic "no specific showing of prej-
udice is required" because when the adversarial process
breaks down "prejudice is presumed".

As established on the record in this case and countless
others assistance of counsel is a substantial constitution-
al right. For the COA to be expanded I "must make a substa-
ntial showing of the denial of a federal right", Barefoot
v. Estelle (463 U.S. 880). The record in this case clearly
establishes that judges of reason have been debating Cronic
claims for over 30 years, so saying that jurists of reason
could do the same thing is not far fetched. Any doubts

E.C.F. 93

EXHIBIT __l 24__

PAGE __3__ OF __3__

about this should be resolved in my favor. Please expand
the COA to include my IAC claim under Cronic that Mr. Olson
failed to subject the prosecution's case to meaningful adv-
ersarial testing when it came to conditions of supervised
release.


## New Evidence: Involuntary Waiver


When reading The Court's opinion I discovered that I
could potentially challenge the voluntariness of my waiver
of appeal as an independent claim (OO, p. 3) "he has not
attacked the validity of his waiver". I did not package
the involuntariness of the waiver as a claim independent of
the involuntariness of the plea agreement as a whole. I did
however attack the involuntariness of the plea in ways that
can independently be applied to the waiver. Ways such as "I
signed that waiver during the plea stage with the understa-
nding that I would be represented by a reasonably competent
lawyer to argue against any computer restrictions at sente-
ncing" and "Had I known that Mr. Olson would completely
abandon me at sentencing I would not have signed such a
waiver or at least would have insisted on a waiver that did
not apply to contested sentencing issues" (My Memo, p. 59)
. The Supreme Court recognized in Hill v. Lockheart (474 U.
S. 52) that in the context of a plea agreement I need only
show a "reasonable probability" that but for counsel's adv-
ise I would not have pled guilty. I ask that The Court app-
ly the same standard to the involuntary waiver I entered

E. C.f. 93            10

EXHIBIT  13 0
PAGE  1  OF 4

late counsel's failure to raise...[meritorious] issue
[...defining element of crime] and [appellate counsel's]
decision instead to raise weaker issues that were unlikely
to succeed fell below prevailing norms of professional con-
duct" in my case the failure being the failure to challenge
sufficiency of the information and instead only challenging
the legality of the unconstitutional release conditions.
"Whether the [court] would have been persuaded is immateri-
al...[abandoning] a non-frivolous claim that was both 'obv-
ious' and 'clearly stronger' is deficient", Shaw v. Wilson
(721 F.3d 908) citing Jones v. Barnes (463 U.S. 745) and
Smith v. Robbins (528 U.S. 259). See also McFarland v. Yak-
ins (356 F.3d 688) "appellate counsel's failure to raise...
argument [that 'would have likely prevailed'] was sufficie-
ntly unreasonable to violate McFarland's right to counsel",
Joshua v. Dewitt (341 F.3d 430) "appellate counsel was ine-
ffective in failing to raise...issue, although not litigat-
ed at trial level, could have been raised on appeal as pla-
in error", and Claudio v. Scully (982 F.2d 798) "there was
a 'reasonable probability' that [my] claim would have been
successful". Please declare Mr. James ineffective on appeal
and vacate my conviction.


My Cronic Claim


In my 59(e) motion (p. 8-10) I went into great detail
about my Cronic claim. I have since realized that the claim
may suffice under Strickland after all. In Dobbs v. Zant

E.C.F. 96

14

EXHIBIT 13 D

PAGE 2 OF 4

(506 U.S. 357) the Supreme Court held that as little as one comment amounting to a concession can render a lawyer's representation constitutionally deficient. See also Francis v. Spraggins (720 F.2d 1190) "counsel's complete concession ...nullifies his right to have the issue...presented...as an adversarial issue and therefore constitutes ineffective assistance." Finally, Horton v. Zant (941 F.2d 1149) in which prejudice under Strickland was established when "Horton's counsel's argument...encouraged rather than discouraged the" sentence and "attempts to distance [himself] from his client could only have hurt Horton's case."

## My Second Ground for Relief

Ground for Relief 2 in my original 2255 (p. 25-36) stated that my plea was not knowing, voluntary, or intelligent due to ineffective assistance of counsel. As the court said (00, p. 8-14 and 19-20) Mr. Olson did prove that he used the phrases "specific intent" and "subjective intent" before I pled guilty, but he never explained their true meaning in his settlement letter. I find this puzzling because although none of the cases cited in the letter described what a "true threat" under 875(c) truly is, he did cite a case at sentencing that upon further review reveals a good explanation. Still at sentencing he never used the explanation from the case to support his arguments (Defendant's Sentencing Memorandum, "DSM", p. 14-16). That case was U.S. v. Cassel (408 F.3d 622) in which the Ninth Circuit defined a

E.C.F. 96

EXHIBIT _130_
PAGE _3_ OF _4_

*Involuntary Waiver*

In my 59(e) motion (p. 10-12) I discussed the involuntary waiver of appellate rights. I have since found examples of plea agreements preserving appellate rights that Mr. Olson should have told me about and if he had I would not have permitted a waiver such as mine, see U.S. v. Corso (549 F.3d 921) "John D. Corso, III may take direct appeal from the sentence" and in the Ninth Circuit U.S. v. Spear (753 F.3d 964) which preserved the right to appeal conviction, so why not the sentence?

As for not being warned of the dangers of being represented by Mr. Olson at sentencing due to his overwhelming desire not to be seen as supporting my business at all and advocating against it. The Ninth Circuit in Cordova v. Baca (346 F.3d 924) treated a defective waiver as prejudicial per-se when it said "failing to provide an adequate warning as to the dangers...and that the record was inadequate to demonstrate that the individual was sufficiently informed of the dangers...to make an intelligent and knowing waiver. The state appellate court applied harmless error review and concluded that the outcome would have been no different if counsel had provided assistance...right...had not been effectively waived, a harmless error analysis could not apply"

.

Cumulative Error

With so many errors of all magnitudes that by themselv-

*E.C.F. 96*

EXHIBIT _13D_
PAGE _4_ OF _4_

es justify vacating my conviction saying that the combination of errors justifies overturning it is a no brainer. In O'Neal v. McAninch (513 U.S. at 435-36) the Supreme Court said "cumulative error doctrine allows a petitioner to present a stand alone claim asserting the cumulative effect of errors at trial that so undermined the verdict as to constitute a denial of his constitutional right to due process". In the Ninth Circuit this applies when an outcome is rendered "fundamentally unfair", Parle v. Runels (505 F.3d 922). Please vacate my conviction due to cumulative error and consider that "when a federal habeas corpus court finds a constituti- nal error and is in grave doubt as to whether the error had a 'substantial' and injurous effect...' the error is not harmless and the petitioner must win", O'Neal.


Rule 59(e) and Rule 15 Relief


Suggested "procedure under which habeas corpus petition- er (1) pleads claims that she reasonably believes to be sup- ported by as yet undiscovered facts that can only be discov- ered through investigative and discovery procedures that become available after a federal petition is filed, then (2) either amends in new facts or amends out claims in light of the post-filing investigation and discovery). New claims may become available because of retroactive changes in the law, newly surfaced legal or factual theories, or the expansion of state remedies. See Advisory Committee Notes to Rule 5 of the Rules Governing Section 2254 Cases in the United States

E.C.F. 9b

EXHIBIT _13_

PAGE _1_ OF _15_

The stated intention of the USPO when justifying the absolute ban violates my First

Amendment right to engage in free speech on the internet. Mr. Preuitt stated that his office was

concerned that I would engage in "antagonistic" speech that could provoke another stalker to

harass or threaten me, and that "on an off day" I might send such a person a threatening email.

To that I say that every person, including a convicted felon on supervised release, has the right

to engage in whatever forms of "antagonistic" speech that he so desires as long as such speech

falls within the protections of the First Amendment. No court has ever held that my websites are

not protected by the First Amendment and This Court specifically stated that they are in fact

legal.

Many courts agree that speech described by most as "offensive" or "antagonistic" is the

type of speech most in need of protection and The Supreme Court is one such court. See Reno

v. American Civil Liberties Union, 560 U.S. 746 (2010) in which they held that the internet

"provides relatively unlimited, low cost capacity for communication of all kinds [including

"offensive" and "antagonistic" kinds]…Through the use of chat rooms, any person with a phone

line can become a town crier with a voice that resonates farther than it could from any soapbox.

Through the use of Web pages, mail exploders, and newsgroups, the same individual can

become a pamphleteer". In Federal Election Commission v. Wisconsin Right to Life Inc, 551

U.S. 449 (2007) they said that "the First Amendment requires [courts] to err on the side of

protecting***speech rather than suppressing it." In Saxe v. State Coll. Area Sch. Dist., 240 F.3d

200 (3d. Cir 2001) the Third Circuit cited the Supreme Court's decision in Brandenburg v. Ohio,

395 U.S. 444 (1969) and Cantwell v. Connecticut, 310 U.S. 296 (1940) when holding that the

First Amendment protects "a wide variety of speech that listeners may consider deeply

offensive, including statements that impugn another's race or national origin or that denigrate

religious beliefs". According to them I have the right to use web pages, mail exploders, and

E.C.F. 108                    Page 5 of 19

EXHIBIT __13/__
PAGE __2_OF __/J__

newsgroups to become a racist pamphleteer if I so choose. Any action by the USPO that

prevents me from engaging in any speech in any forum including the internet for any reason

violates my right to offend whoever I want to at any time and by any means within the limits of

the First Amendment.

I also began writing a book about my experience while in prison and I have a right to use

a computer to finish it. I also have a right to use the internet to market it to potential publishers.

### Unjustified Employment Restrictions

Had I been represented by competent counsel at sentencing these conditions would

have been challenged as employment restrictions because any "conditions that 'limit[] the terms

on which the defendant' may engage in a specified occupation", United States v. Britt, 332 F.3d

1229 (9th Cir. 2003) such as mine with which my "ability to get a job and work in the field for

which he was trained would be significantly impacted", United States v. Sunday, 447 Fed. Appx.

885 (10th Cir. 2012) are employment restrictions and subject to the requirements of U.S.S.G.

5F1.5 even though they do not name any specific occupation as prohibited. 5F1.5 states that to

prohibit a "defendant from a business, or profession, or limiting the terms on which the

defendant may do so" The Court must determine that:

1) a reasonable direct relationship existed between the defendant's occupation, business, or
profession and the conduct relevant to the offense of conviction; and (2) imposition of such a
restriction is reasonably necessary to protect the public because there is a reason to believe
that, absent such restriction, the defendant will continue to engage in unlawful conduct similar to
that for which he was convicted.

E. C.f. 108

EXHIBIT 13 1
PAGE 3 OF 15

The USPO does not claim that running my business by itself would result in more threatening emails. They only claim that I would be more likely to encounter "another Amanda Falke", so no evidence is even alleged that absent such a condition I would continue to send threatening emails. The allegation is merely that I may continue to send threatening emails if I encounter "another Amanda Falke". 5F1.5 does not permit employment restrictions based on a belief that the defendant will encounter people that piss him off.

Such restrictions are normally reserved for cases in which the defendant's occupation or business was essential to the offense. By that I mean that absent working in a specific field or running a particular business the defendant could not have committed the crime. It is not enough to simply say that the defendant committed the crime at work while working in a specific field or at a particular company. See United States v. Wittig, 528 F.3d 1280 (10th Cir. 2008) "The offense of conviction was based on Wittig's personal conduct, not his conduct as an executive... the mere fact Wittig engaged in such conduct while employed as an executive does not establish the necessary connection between the conduct and his managerial/executive positions" striking down a prohibition on having "any authority over any business" or "engag[ing] in financial transactions" that was imposed on the grounds that if employed in such a capacity Wittig "would be responsible for a multitude of financial documents" where he might be tempted to make false claims on additional financial documents. The Britt court reached a similar conclusion saying that Britt's history of making false identification cards as part of his drug business did not justify banning him from running a credit repair business to prevent him from engaging in further acts of fraud. Both courts held that employment restrictions can only be imposed "for the minimum time and to the minimum extent necessary to protect the public". If the USPO justifies keeping me from running my business as a means to prevent me from

E.C.F. 108

EXHIBIT __13 ′__
PAGE __4__ OF __15__

sending threatening emails then such justification cannot possibly justify prohibiting me from

working in my field at all as the minimal employment restriction necessary.


In my case the only relationship between my "crime" and my occupation or business can

best be described as a coincidence. I ran a website that angered someone to the point of

stalking me in an attempt to coerce me into removing content that I had every right not to

remove. I had been the subject of a lot of negative public criticism from all sorts of people

including celebrities, politicians, and subjects of articles other people published through my

services. At no point have I ever been accused of sending threatening emails to anyone else. It

wasn't until someone harassed me, threatened me, and my family that I responded with what I

felt was a smaller dose of her own medicine. No one, including The Government at the height of

their smearing of me,  has ever suggested that had we met some other way and she had done

the same things that my response would have been different.


My attorney at the time, Per Olson, compared my restrictions to those that might be

imposed on a stock broker convicted of insider trading that prohibit him from trading stocks

while on supervised release. I don't believe that to be an appropriate comparison and his use of

such an example leaves me puzzled as to why he did not raise a 5F1.5 challenge at sentencing,

but such arguments are best left for my 2255 (E.C.F. 70 p. 36-62, E.C.F. 91 p. 10-20, E.C.F. 93

p. 8-10, E.C.F. 96 p. 14-15). A better example would be a stock broker that made a bad trade,

lost someone's money, was then relentlessly stalked by a deranged client demanding a refund,

and eventually snapped by sending that lunatic a threatening email. Such a case would not

justify banning him from trading stocks while on release to avoid losing "another Amanda

Falke's" money because he never made any illegal trades. Anger management and monitoring

of his email would suffice.

E.C.F. 108

EXHIBIT  131
PAGE  5  OF  15

I was personally shocked when reading United States v. Butler, 694 F.3d 1177 (10th Cir. 2012) in which a prohibition on "hunting, fishing, and trapping wildlife" imposed after the defendants "encouraged their clients to violate state hunting laws" by poaching deer during guided tours they led professionally on the grounds that such conditions would "interfere with his occupation" managing "a commercial deer operation." Personally, I thought that a convicted poacher working as a deer hunter would be just as tempted to engage in illegal hunts as the stock broker would be to make illegal trades. Both broke the law to increase profit but the same cannot be said of me. I have suffered more than I ever thought possible due to my email and would never consider sending another one a good decision for my business. If I ever let my personal issues interfere with my professional judgment again I will deserve what I get for it.

I want to wind down this section by emphasizing the importance of Activity Based Costing ("ABC") when evaluating any business including mine. I learned about ABC in business school and it basically involves breaking down costs into activity pools when determining the health of the business. For instance a business that appears unprofitable may appear to some as one that should be shut down. Apply ABC and you may find that the costs making it unprofitable can be traced to activities that can be improved or eliminated, after which the business becomes profitable. Apply ABC to my business and it quickly becomes clear that it was profitable until there was a problem with the email activity. That activity can be further broken down to the threatening email activity and after that is easily removed it becomes profitable again. To say otherwise would have earned me an F on any exam, so I have no problem, as the only person involved in this matter with a business degree, giving The Government and This Court an F in cost analysis.

E.C.f. 108

EXHIBIT 131
PAGE 6 OF 15

That is not to say that I never made decisions that I knew would decrease my margin. I knowingly allowed users to edit or delete their work and that work included comments that allowed all sides to be heard. Other websites have been known to abstain from offering such functionality in order to increase reputation management/content removal sales, so I really don't feel like I deserve to be singled out just for requiring proof that a user has abused a service before I remove stuff or for offering to block content from search engines for a reasonable fee if someone for whatever reason cannot get it removed by some other means under the policy.

Finally, I have every right to be self employed as an author and use computers to aid myself in that effort even though I won't be able to finish the book until my fight with The Government is over with. It is difficult to gauge how good it will be when I don't know how it will end, but I can't think of any good reason why it cannot be almost finished before my legal cases are resolved.

## 18 U.S.C. 3553 and 3583 Non-Compliance

The law regarding 18 U.S.C. 3553 and 3583(d)(2) clearly establishes that conditions of release and the enforcement of such conditions must "involve 'no greater deprivation of liberty than is reasonably necessary for the purposes of supervised release' that is, to achieve deterrence, public protection, or offender rehabilitation." United States v. Sales, 476 F.3d 732 (9th Cir. 2007). The Ninth Circuit held that in my case and others like it the conditions as written comply with this section. As written they permit all forms of speech including online speech. They do not say that I cannot use a computer or that a probation officer cannot permit me to use a computer for any lawful activity, so they do not necessarily result in an unreasonable

E.C.F. 108

EXHIBIT __131__
PAGE __2__ OF __15__

deprivation of liberty because a probation officer can make sure that they are only enforced to the minimal extent necessary to protect the public from future crimes.

Unfortunately, that is not how they are being enforced in this case. They are being enforced in a manner that the Ninth Circuit and other courts have consistently ruled to be greater than necessary to protect the public as I previously described (p. 1-2 ). For instance if I were a sex offender convicted of a more serious offense, such as child pornography, a probation officer refusing to grant me permission to use a computer to read news articles about children would constitute over broad enforcement under United States v. Riley, 576 F.3d 1046 (9th Cir. 2009). Likewise refusing to permit me to view pornography would also be too broad under United States v. Stoterau, 524 F.3d 988 (9th Cir. 2008). If such words as "pornography" are too broad to describe what types of computer use are allowed than surely the broader term of "computer" is overly broad enforcement that fails to satisfy the statute on a larger scale.

The conditions are not being enforced to the minimum extent necessary to protect the public from threatening emails. As of now I cannot use a computer at all because they say running my business might increase the likelihood that I encounter "another Amanda Falke", and such an encounter might increase the likelihood of me sending a threatening email. None of that justifies restricting me from forms of lawful computer use that does not involve running my websites and it does not justify refusing to permit me to run the sites under a condition restricting email activity. I suggested monitored email use so that I would know that getting away with sending a treating email would be nearly impossible. Such a threat would constitute a new criminal conduct violation under U.S.S.G. 7B1.1 which carries a higher sentencing range than a technical violation, so I don't see how making unauthorized computer use a technical violation

E.C.F. 108

EXHIBIT 131
PAGE 8 OF 15

deters threats any more than the more serious new criminal conduct remedies other than by

giving the USPO an easier way to monitor me for new criminal conduct.


As it stands the USPO offers no explanation how limiting my ability to fight my legal

cases, engage in benign internet use unrelated to my business, work in my field, or look for a

job would satisfy any 3553 factors. They also fail to explain how allowing me to run my business

would endanger the community because even if I did encounter "another Amanda Falke" they

can't show I would be tempted to threaten her any more than a pedophile would be tempted to

keep molesting little kids if he were allowed to read a news article about kids or view

pornography.


## Enforcement Would Not Serve the Public Interest


If I were to choose to exercise my right to run my business despite these conditions

without permission from the USPO I do not believe that it would be in the public's best interest

to incarcerate me for it. This may sound extreme, so before the government can accuse me of

making threats of any sort I want to say that I am merely presenting The Court with an honest

analysis of the situation that would most likely exist in such a scenario.


Whenever you have a system built for one purpose and try to use it for another because

it might work there will almost always be problems. In this case the criminal justice system was

built to fight crime and not speech by those convicted crimes, so if you start using it to fight

lawful activities you may find it largely ineffective at doing so in some cases. This is such a case

and if it were not using this system to shut me up would be easy.

E.C.f. 108

EXHIBIT 13 i
PAGE 9 OF 15

When the SilkRoad website was taken down all the FBI needed was the IP address of the server and the ability to use a mutual law enforcement assistance treaty to seize it. That worked because SilkRoad was a criminal enterprise illegal in this country and that one. That is not the case with my websites because like SilkRoad they are hosted abroad, but unlike SilkRoad they are not illegal in this country or that one. Usually to enforce such treaties the alleged crime must constitute an offense in both countries for one to help the other. In the event that any law enforcement agency in the United States were to approach the hosting company with a court order of any sort they would not honor it and their government would not be able to help, especially if the only allegation is that the owner of the site turned it on in violation of supervised release conditions. As a result if I were to be incarcerated for turning them on they would most likely stay up the entire time that I remain behind bars.

The last time I was incarcerated the sites only went down due to treachery and bad luck. I discussed the treachery in my 2255 (E.C.F. 70 p. 82-88) and that could easily be prevented by paying the hosting company enough money to cover their services for the entire time that I am incarcerated or by choosing a similar company that offers automated payment solutions. Either would permit the sites to stay up as long as usage remains within system limits and there are no critical hardware failures. The bad luck was due to my other server suffering a critical hard disk failure in which all data was lost and I was not free to provide backups. There really isn't anything that could have been done about that, but due to auto payments my syndication and data mining sites stayed up for many months following my arrest. During that time period the FBI received some complaints from people that it was impossible to remove syndicated content from those sites. This was because the feature for removing syndicated content required that the source website be live on the web and the source page to be missing. As a result of my

E.C.F. 108

Page 13 of 19

EXHIBIT ___13 i___
PAGE _10_ OF _15_

main server going down it was not possible to check source URLs for the 301 or 404 status codes necessary to trigger a removal.

This creates a scenario in which enforcing the violation of any condition of supervision in such a way that incarcerates me for any significant time period would not be a good idea because without me free to police the sites the public would be free to abuse them any way they wish until my release. After my arrest Amanda Falke told Sean Hoar that her circumstances were so much worse that she didn't care whether I was in jail or not as long the sites stayed up. Had I been freed and able to honor my offer to remove content about her things would have improved for her much faster. I have not had a chance to look at any user generated content created since my arrest, but given the amount of media coverage I can only imagine what my users were up to. While in prison I read an interesting Time magazine piece about how people that do content management for Facebook see the worst in people a lot and I knew exactly how they felt. I've seen people do a lot of despicable things and nobody really gets to see or give me credit for what I've removed. If I were to spend 5-11 months in jail for a technical violation as the guidelines recommend I am certain the chaos that would take place in my absence, especially if the press covers my incarceration, would be far worse than any alleged emotional distress that would occur during normal operations.

I would never under any circumstance consider abuse of my services that take place while circumstance beyond my control prevent me from being able to do anything about it my fault. Many would agree with me and there would be serious hurdles for anyone trying to hold me legally liable for failing to remove content that The Court prevents me from being to able to remove. I would blame The Court for choosing to incarcerate me despite being advised of the potential risk. I know many people including The Court would blame me, but to that I would say

E.C.F. 108

EXHIBIT ___13 / ___
PAGE _11_ OF _15_

that I am just a peaceful non-violent protester openly resisting an overbearing government with the hope that someday it chooses to honor the Constitution. I would use any opportunity that may arise to raise awareness for my cause to voice my opinion as much as possible that when any government fails to honor its own constitution it waives any legitimate claim of right to govern at all and that when faced with such tyranny every citizen has a civic duty not to follow any order issued by such an illegitimate government. If The Government accuses my actions of being a security issue for society in any way I will defend myself by saying that "any society that would give up a little liberty to gain a little security will deserve neither and lose both", Benjamin Franklin.

At this point I would like to express my gratitude to Apple Inc. for fighting the good fight by choosing to protect the rights of their users from the prying eyes of the FBI when they chose not to build a backdoor into the iPhone despite a court order to do so. I've been glad that the data of my users was protected when I caught my case due to my decision to use an offshore host because otherwise I'm sure the FBI would have used it as an excuse to seize all their information. It is unfortunate that the FBI claims to have found another way in because I would have liked to have seen if the FBI has the audacity to arrest Tim Cook or any of his employees for refusing to help them. Sure, they had a court order, but would arresting people that are not criminals just for technically breaking the law for the greater good have helped society, made the FBI look good, or done anything other than cause greater problems? I don't think so and I don't think persecuting me for technical violations that fall within the scope of the First Amendment would either. Often fights for liberties such as these fall on the shoulders of reluctant people that do not live a criminal lifestyle and would rather be doing other things. I consider myself one of those people because before my incarceration other than being an occasional loose cannot that smoked marijuana there was nothing criminal about me and I

E.C.F. 108                    Page 15 of 19

EXHIBIT __13|__
PAGE __12__ OF __15__

would rather be doing many other things than fighting for my rights right now. Unfortunately, I

find this fight forced on me and I would have no problem choosing to do what I think would be

best for my career and my users even if there is a court order in place saying that I cannot.


I am not afraid of anything This Court can do to me. There was a time when the idea of

going to prison scared me and then once at FCI Sheridan the idea of going to a USP scared

me. Now that I've been to one of the worst places that the BOP could have sent me I am not the

least bit frightened by the thought of going back for 24 months instead of living under this yolk

for 35 (E.C.F. 91 p. 16-20, Exhibit 3). In fact I've felt less safe walking down some streets since

my release than I did walking the prison yard at USP Victorville. Still there are many things I

would rather do than go back.


As much as I would like to turn my sites on today This Court has me in a bit of a bind at

the moment. I need to remain free long enough to prosecute my appeal and file a lawsuit

against BOP. I discussed how impeding prison conditions are when fighting a case (E.C.F. 98 p.

2-5) and the basis for the lawsuit (E.C.F. 91 Exhibit 4) in my 2255. I am hoping to get this

conviction vacated so that I wont need to choose between prison and tolerating the intolerable. I

learned the hard way that it is almost impossible to get any lawyer to take a case while an

inmate because most law firms do not answer your letters, their phones have prompts that cant

accept calls, and most wont take cases on a commission basis from inmates due to the overall

poor credibility of inmates in general. Since my release I've spoken to a lawyer that wants to see

the surveillance tape, but the internal affairs officer that has it wouldn't give it to me and other

people at Victorville seem to have employed every excuse in the book to justify not letting me

see it, so I am awaiting a response to a FOIA that I sent to their general counsel. Who knows,

maybe they will settle for enough that I can fund a 35 month vacation during which I probably

E.C.F. 108

EXHIBIT ___13___
PAGE _13_ OF _15_

wouldn't feel like running my business with or without these conditions, but torts take awhile, so

does writing a book, and in the meantime I need an income.

### Relief Requested

I ask that due to the USPO abusing conditions 7 and 8 to the point of constructively

creating unlawful release conditions that This Court eliminate them entirely. Obviously the

USPO cannot be trusted to enforce them to the minimal extent necessary to satisfy the

purposes of supervised release.

Alternatively I request that if This Court will no strike them down entirely that they be

modified to permit monitored access by inserting the word "unmonitored" before the word

"computer(s)" in condition 7 and "any online" in condition 8. The resulting conditions would read

as follows:

7. The defendant is prohibited from using or possessing any <u>unmonitored</u> computer(s) and/or
directing third parties to do so on his behalf (including any handheld computing device, any
electronic device capable of connecting to any online service, or any data storage media)
without the prior written approval of the U.S. Probation Officer. This includes, but is not limited
to, computers at public libraries, Internet cafes, or the defendant's place of employment or
education.

8. The defendant is prohibited from accessing any <u>unmonitored</u> online computer service and/or
directing third parties to do so on his behalf at any location (including employment or education)
without the prior written approval of the U.S. Probation Officer.

As part of this I ask that The Court order the USPO to facilitate monitored access to two

desktop computers at my home,  a smartphone, and any other devices or services in a timely

E.C.F. 108

EXHIBIT 13 1
PAGE 14 OF 15

manner upon request unless they can show cause that I intend to use them for a criminal purpose.

If neither of those work I ask that I at least be able to seek work in my field, use a computer at home for recreational use, and to develop examples of my work for potential employers. This Court said on 11/3/2014 that I should be able to work in the computer industry, but doing so is extremely difficult without examples to show people. This seriously interferes with the exit strategy I had when launching my business which was to develop marketable skills to improve my employability should the business fail. The Village Voice praised one of my sites for its "workmanlike design", Anderson Cooper said that it was so professionally designed that he felt like he was browsing a government registry, and I've found traditional work as a result of my websites. Now I can't show anyone these things to get an edge, but with permission I could build new sites using a lot of the same code as demonstrations. That wouldn't put me at risk of encountering "another Amanda Falke".

I will at a minimum need a computer at home to look for work. Scheduling appointments to use the one at the probation offices is not sufficient and neither is Mr. Preuitt's idea that I could "go door belling".

### Conclusion

The only way to protect my right to free speech in the least restrictive way possible while protecting the public is to strike down or modify my conditions of release. As someone that doesn't live a criminal lifestyle computers are all that stand in the way between prison and being

E. C. fi 108

EXHIBIT 131
PAGE 15 OF 15

one of the easiest people in town to supervise. I request that The Court schedule a hearing to

address this matter as soon as possible.

Respectfully Submitted,

_____

Cyrus Sullivan
Defendant
Pro Se

PAGE ___ OF ___

EXHIBIT ___

CLIENT'S COPY

EXHIBIT _132_

PAGE _1_ OF _3_

BILLY J. WILLIAMS, OSB #901366
United States Attorney
District of Oregon
**JOHNATHAN S. HAUB, OSB #761653**
Assistant United States Attorney
John.Haub@usdoj.gov
1000 SW Third Ave., Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Facsimile: (503) 727-1105
Attorneys for United States of America

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:13-CR-0064-HZ** |
| v. | **GOVERNMENT'S MOTION TO MODIFY CONDITIONS OF SUPERVISED RELEASE** |
| **CYRUS ANDREW SULLIVAN,** | |
| **Defendant.** | |

The United States of America, by and through Billy J. Williams, United States Attorney, and Johnathan S. Haub, Assistant United States Attorney, moves to amend special conditions of supervised release number 7, 8 and 10 as well as to add a special condition number 12 to require the probation officer's prior approval of employment. This motion is filed in connection with the government's memorandum response to Defendant's Motion to Modify Conditions of Release (ECF No. 108).

/ / /

/ / /

/ / /

EXHIBIT 1 3 2

PAGE 2 OF 3

## I.   DISCUSSION

Special condition number 7 presently provides as follows:

> The defendant is prohibited from using or possessing any
> computer(s) and/or directing third parties to do so on his behalf
> (including any handheld computing device, any electronic device
> capable of connecting to any on-line service, or any data storage
> media) without the prior written approval of the U. S. Probation
> Officer. This includes, but is not limited to, computers at public
> libraries, Internet cafes, or the defendant's place of employment or
> education.

Special condition number 8 presently provides as follows:

> The defendant is prohibited from accessing any on-line computer
> service and/or directing third parties to do so on his behalf at any
> location (including employment or education) without the prior
> approval of the U. S. Probation Officer.

The government seeks to amend the above conditions as follows:

Special Condition 7:
   The defendant shall participate in the U. S. Probation Office's computer
monitoring program, which may include installation of software or hardware on
the defendant's computer that allows random or periodic monitoring of
defendant's computer use, periodic inspection of defendant's computer (including
retrieval, copying, and review of its electronic contents) to determine defendant's
compliance with the monitoring program and conditions of supervision.
   Defendant's computer use and his participation in this monitoring program
extends to those computers, software programs, smartphones, cellular phones,
tablets and related devices capable of connecting to any on-line service, or data
storage media allowing access to electronic services and the Internet. (previous
language to be removed)

Special Condition 8:
   Defendant shall not own or operate, directly or indirectly, any former
website, including "STDCarriers.com," "nolimitlist.com," or any similar website
that offers reputation management services or otherwise involves the removal of
names, titles, identities, phone numbers, email addresses, or any other personal
information from such websites or other publications, whether or not payment of
money is required, without the prior written approval of the U.S. Probation
Officer. (previous language to be removed)

**Government's Motion To Modify Conditions of Supervised Release**          **Page 2**

EXHIBIT 1 3 2
PAGE 3 OF 3

The government also moves to amend Special Condition 10 to read:

      The defendant shall have no contact with A. K. (the victim identified in the pre-sentence report), by email, text, or any other electronic means, in person, by telephone, through correspondence or a third party unless approved in advance by the probation officer.

      The government also moves to add Special Condition 10 to read: "The defendant's employment shall be subject to approval by the probation officer. "

      The above suggested modifications and the proposed addition of special condition number 12 have been provided to defendant through his counsel Ruben Iniguez, who advised that the defendant would consent to an order amending special conditions 7 and 10, but not 8 and 12.

## II.   REQUESTED RELIEF

      For the reasons stated in a separately filed memorandum of law, the government's motion to amend special conditions of supervised release 7, 8 and 10 should be granted. The Court should also add a special condition (number 12) requiring that the defendant seek approval for employment from his probation officer.

      Dated this 22nd day of July 2016.

                    Respectfully submitted,

                    BILLY J. WILLIAMS
                    United States Attorney

                    */s/ Johnathan S. Haub*
                    JOHNATHAN S. HAUB, OSB #761653
                    Assistant United States Attorney

EXHIBIT ___133___
PAGE _1_ OF _2_

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

The government acknowledges that a total ban on computer/internet use is unwarranted and not likely to withstand judicial scrutiny under current Ninth Circuit precedent. *See United States v. LaCoste*, 811 F.3d 1187 (9th Cir. May 12, 2016) (former Chief Judge Aiken plainly erred in imposing total ban on internet use without the Probation Officer's approval despite fact that defendant used internet to post disparaging comments about victims). In light of this rule, the Government seeks to narrowly tailor the restrictions on internet use and computer use to "produc[e] no greater deprivation of liberty than is reasonably necessary." *United States v. Sales*, 476 F.3d 732, 737 (9th Cir. 2007).

The government has filed a motion to amend the special conditions of supervised release in this case as follows:

Special Condition 7 to be amended to read:
    The defendant shall participate in the U. S. Probation Office's computer monitoring program, which may include installation of software or hardware on the defendant's computer that allows random or periodic monitoring of defendant's computer use, periodic inspection of defendant's computer (including retrieval, copying, and review of its electronic contents) to determine defendant's compliance with the monitoring program and conditions of supervision.
    Defendant's computer use and his participation in this monitoring program extends to those computers, software programs, smartphones, cellular phones, tablets and related devices capable of connecting to any on-line service, or data storage media allowing access to electronic services and the Internet. (previous language to be removed)

**Government's Response to Defendant's Motion to Modify Conditions of Supervised Release**          **Page 3**

EXHIBIT _/33_

PAGE _2_ OF _2_

Special Condition 8 to be amended to read:
    Defendant shall not own or operate, directly or indirectly, any former website, including "STDCarriers.com," "nolimitlist.com," or any similar website that offers reputation management services or otherwise involves the removal of names, titles, identities, phone numbers, email addresses, or any other personal information from such websites or other publications, whether or not payment of money is required, without the prior written approval of the Probation Officer. (previous language to be removed)

Special Condition 10 to be amended to read:
    The defendant shall have no contact with A. K. (the victim identified in the pre-sentence report), by email, text, or any other electronic means, in person, by telephone, through correspondence or a third party unless approved in advance by the Probation Officer.

Special Condition 12 to be added to read:
    The defendant's employment shall be subject to approval by the Probation Officer. The above suggested modifications and addition have been provided to defendant through his counsel Ruben Iniguez who advised the government that the defendant would consent to amended conditions 7 and 10, but not 8 and 12.

Defendant's objection to the terms of special condition 8 as previously written at the time of his sentencing, has been raised before, and rejected in *United States v. Sullivan*, No. 13-30207, 588 F. App'x 631 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 1877 (2015), which noted that the use of a computer and the Internet were essential to the commission of defendant's crime. The terms of amended special condition 8 are less restrictive and more favorable to defendant's quest for internet and computer use. As counselled by USSG § 5F1.5, the originally imposed standard and special conditions were subject to the provisions of that Guideline which the Court imposed as reasonably necessary to protect the public, and prevent repetitive illegal conduct but not to punish the defendant. Should defendant's probation officer unreasonably restrict the terms of special condition 8, such a denial of access can be swiftly brought before the Court. Here, defendant's probation officer is prepared to permit internet and computer use under conditions designed to allow defendant to seek employment, pursue his literary endeavors, engage in legal

**Government's Response to Defendant's Motion to Modify Conditions of Supervised Release**                            **Page 4**

EXHIBIT  13 4

PAGE  11  OF  16

"unambiguous and precludes an appeal of the challenged terms of supervised release."

*Id.*

On May 9, 2016, Mr. Sullivan commenced his three-year term of supervised release. On June 10, he filed a *pro se* Motion to Modify Conditions of Release. ECF 108. By way of the motion, Mr. Sullivan initially sought to modify, if not eliminate, Special Conditions 7 and 8. He sought to modify Special Condition 7 to permit him to use computers and electronic devices, subject to monitoring by the U.S. Probation Office. *Id.* at 17. He similarly sought to modify Special Condition 8 to allow him to access "online computer service[s]." *Id.* In lay terms, Mr. Sullivan sought the Court's authorization to use computers and access the Internet and, more specifically, to operate the websites he had managed for four years before his arrest—again, subject to monitoring by the U.S. Probation Office. *Id.*

## III.    The Parties' Partial Resolution.

The Ninth Circuit recently held that a total ban on Internet use is overbroad and unwarranted, and that "a proviso for probation-officer approval does not cure the problem." *United States v. LaCoste*, 821 F.3d 1187, 1192 (9th Cir. 2016) (citing *United States v. Sales*, 476 F.3d 732, 737 (9th Cir. 2007)). In light of the appellate court's ruling in *LaCoste*, the government now concedes that "an unqualified and total ban on computer usage is improper." *See* ECF 115 at 2. As a result, the parties have agreed to jointly recommend

EXHIBIT ___134___

PAGE ___2___ OF ___16___

pursuant to the terms of a plea agreement, Mr. Sullivan waived his right to Indictment and pleaded guilty to the Information.  ECF 43-46.

On July 18, 2013, this Court sentenced Mr. Sullivan to 24 months' imprisonment and three years' supervised release.  ECF 54.  In addition to the standard conditions of supervision, the Court imposed 11 special conditions.  *Id.* at 3.  Special Conditions 7, 8, and 10 are relevant to this motion.  Those conditions currently state:

> 7. The defendant is prohibited from using or possessing any computer(s) and/or directing third parties to do so on his behalf (including any handheld computing device, any electronic device capable of connecting to any on-line service, or any data storage media) without the prior written approval of the U.S. Probation Officer. This includes, but is not limited to, computers at public libraries, Internet cafes, or the defendant's place of employment or education.
>
> 8. The defendant is prohibited from accessing any on-line computer service and/or directing third parties to do so on his behalf at any location (including employment or education) without the prior written approval of the U.S. Probation Officer.
>
> * * *
>
> 10. The defendant shall have no contact with A. K. (the victim identified in the pre-sentence report), in person, by telephone, through correspondence or a third party unless approved in advance by the probation officer.

*Id.*[5]

Mr. Sullivan directly appealed the Court's imposition of Special Conditions 7 and 8.  *See United States v. Sullivan*, 588 F. App'x 631 (9th Cir. 2014) (unpublished mem.).  The Ninth Circuit denied the appeal on the ground that his written waiver of appeal was

---

[5] At the time of sentencing, Mr. Sullivan objected to the imposition of Special Conditions 7 and 8.  *See* ECF 51 at 20.

Page 5    REPLY MEMORANDUM IN SUPPORT OF MOTION TO MODIFY CONDITIONS OF SUPERVISED RELEASE

EXHIBIT _134_
PAGE _3_ OF _16_

that the Court replace the language of Special Condition 7 with the following new

language so that it will now read:

> 7.    The defendant shall participate in the U. S. Probation Office's computer
> monitoring program, which may include installation of software or
> hardware on the defendant's computer that allows random or periodic
> monitoring of defendant's computer use, periodic inspection of defendant's
> computer (including retrieval, copying, and review of its electronic
> contents) to determine defendant's compliance with the monitoring
> program and conditions of supervision.  Defendant's computer use and his
> participation in this monitoring program extends to those computers,
> software programs, smartphones, cellular phones, tablets and related
> devices capable of connecting to any on-line service, or data storage media
> allowing access to electronic services and the Internet.

ECF 115 at 3.

The parties also have agreed to modify Special Condition 10 to make clear that Mr.

Sullivan shall have no contact with A. K. by email, text, or any other electronic means.

The parties jointly recommend that the Court amend the language of Special Condition

10 so that it will now read:

> 10.    The defendant shall have no contact with A. K. (the victim identified in the
> presentence report), by email, text, or any other electronic means, in person,
> by telephone, through correspondence or a third party unless approved in
> advance by the Probation Officer.[6]

ECF 115 at 4.

---

[6] If the Court prefers, Mr. Sullivan does not oppose an absolute ban on all contact with
A.K.  He does not oppose the deletion of the phrase "unless approved in advance by the
Probation Officer."

Page 7    REPLY MEMORANDUM IN SUPPORT OF MOTION TO MODIFY CONDITIONS OF
        SUPERVISED RELEASE

EXHIBIT _134_
PAGE _4_ OF _16_

## IV.    The Parties' Disagreement.

The parties have not been able to reach an agreement on an appropriate modification to Special Condition 8.  Mr. Sullivan recommends that the Court amend Special Condition 8 in the least restrictive manner possible, namely, by inserting the word "unmonitored" so that it will now read:

> 8.      The defendant is prohibited from accessing any unmonitored online computer service and/or directing third parties to do so on his behalf at any location (including employment or education) without the prior written approval of the U.S. Probation Officer.

ECF at 4.

The government, by contrast, proposes that the language of Special Condition 8 be deleted in its entirety and replaced with the following new language which would prohibit Mr. Sullivan from operating stdcarriers.com or any similar websites:

> Defendant shall not own or operate, directly or indirectly, any former website, including "STDCarriers.com," "nolimitlist.com," or any similar website that offers reputation management services or otherwise involves the removal of names, titles, identities, phone numbers, email addresses, or any other personal information from such websites or other publications, whether or not payment of money is required, without the prior written approval of the Probation Officer.

ECF 115 at 4.

The government also proposes that the Court add yet another Special Condition, number 12, to require that Mr. Sullivan's "employment shall be subject to approval by the Probation Officer."  *Id.*

Page 8      REPLY MEMORANDUM IN SUPPORT OF MOTION TO MODIFY CONDITIONS OF SUPERVISED RELEASE

EXHIBIT __13⁴__

PAGE __5__ OF __16__

Mr. Sullivan opposes the government's requests to delete and replace the language

of Special Condition 8, and to add a new Special Condition 12.

## V.    Jurisdiction to Amend Conditions of Supervised Release.

The Court has jurisdiction to modify the terms and conditions of Mr. Sullivan's

supervised release under 18 U.S.C. § 3583(e).

## VI.    The Law Relative to Special Conditions of Supervised Release.

District courts "enjoy broad discretion" in imposing conditions of supervised

release. *Lacoste*, 821 F.3d at 1190. However, any condition imposed must be reasonably

related to the nature and circumstances of the offense, the history and characteristics of

the defendant, or the sentencing-related goals of deterrence, public protection, or

rehabilitation. *Id.* at 1190–91 (citations omitted); *see also* 18 U.S.C. § 3583(d). Every special

condition "must be consistent with the Sentencing Commission's policy statements."

*LaCoste*, 821 F.3d at 1191. Finally, "the condition may involve 'no greater deprivation of

liberty than is reasonably necessary' to serve the goals of supervised release." *Id.* (quoting

18 U.S.C. § 3583(d)(2)).

The U.S. Sentencing Guidelines require that the Court find not only "a reasonably

direct relationship" between Mr. Sullivan's prior occupation and the conduct relevant to

the offense of conviction, but also that imposing a certain occupational restriction is

"reasonably necessary to protect the public because there is reason to believe that, absent

Page 9    REPLY MEMORANDUM IN SUPPORT OF MOTION TO MODIFY CONDITIONS OF
SUPERVISED RELEASE

EXHIBIT _134_

PAGE _6_ OF _16_

such restriction, the defendant will continue to engage in unlawful conduct similar to that for which the defendant was convicted." U.S.S.G. § 5F1.5(a). The Court must impose any "condition for the minimum time and to the minimum extent necessary to protect the public." U.S.S.G. § 5F1.5(b).

**VII.    The Court Should Not Modify Special Condition 8 To Ban Mr. Sullivan From Operating His Former Websites.**

**A.    A Total Ban on stdcarriers.com Implicates Heightened Scrutiny.**

From 2008 to 2012, Mr. Sullivan made his living by operating various websites, including stdcarriers.com and an associated reputation management web business. He earned "approximately $2,500 per month from that business in 2008 and 2009." Exhibit B at ¶ 65.

Because the government's proposed amendment to Special Condition 8 would, like the current version, totally ban Mr. Sullivan from operating his web business, it constitutes an "occupational restriction." *United States v. Stoterau*, 524 F.3d 988, 1009 (9th Cir. 2008). The Ninth Circuit has interpreted the Sentencing Guidelines as requiring "heightened scrutiny" of occupational restrictions. *Id.* at 1009. *See also United States v. Paul*, 274 F.3d 155, 171 n. 18 (5th Cir. 2001) (where a defendant's primary means of supporting himself are involved, a higher level of scrutiny for occupational restrictions applies under § 5F1.5). Moreover, because the government's proposed modification of Special Condition 8 would restrict Mr. Sullivan's First Amendment right to free speech,

Page 10    REPLY MEMORANDUM IN SUPPORT OF MOTION TO MODIFY CONDITIONS OF SUPERVISED RELEASE

EXHIBIT __134__

PAGE __7__ OF __16__

it is subject to "special scrutiny," *United States v. Lawson*, 670 F.2d 923, 930 (10th Cir. 1982),

and must be "reviewed carefully" on appeal. *United States v. Terrigno*, 838 F.2d 371, 374

(9th Cir. 1988).[7]

### B.   A Total Ban On Mr. Sullivan's Operation Of His Former Websites Is Not Reasonably Related To His Offense Of Conviction.

Against the backdrop of heightened scrutiny, it is critical to focus narrowly and

directly on the nature of the offense of conviction, namely, making a threatening

communication. *See United States v. Britt*, 332 F.3d 1229, 1233 (9th Cir. 2003) ("§ 5F1.5

limits occupational restrictions to *those based on the offense of conviction*." (emphasis

added)).

Mr. Sullivan was convicted of a single count of making a threatening

communication by email. *See* ECF 40 ("defendant . . . knowingly transmitted . . . a

communication containing a threat to injure the person of another."); ECF 46 at ¶ 24 ("I

knowingly and intentionally transmitted . . . an email communication containing a threat

to injure the person of another"). There is no mention of stdcarriers.com or any other

---

[7] At the sentencing hearing, the Court assumed, without deciding, that Mr. Sullivan's website was legal, and he had a First Amendment right to operate it. *See* ECF 64 (Sentencing Transcript) at 45:15-21 ("Now, I don't want to get into a debate with you about whether that website [w]as legal or not, whether you have a First Amendment right or not, because that's not important to me. I'll assume you did have a First Amendment right to run the kind of website you did. Let's operate under the assumption that it's completely legal --").

Page 11    REPLY MEMORANDUM IN SUPPORT OF MOTION TO MODIFY CONDITIONS OF SUPERVISED RELEASE

EXHIBIT  134 .
PAGE  8  OF  16

website in the Information, Plea Agreement, Plea Petition, or Judgment.  *See* ECF 40, 45,

46, and 54.  In fact, although the parties' agreement contains a lengthy recitation of those

"Facts/Relevant Conduct" they agreed could be proven beyond a reasonable doubt,

stdcarriers.com is not discussed.  Why?  Because Mr. Sullivan's operation of the site had

little, if anything, to do with the offense.  The only connection between his management

of the website and the underlying offense stems from the fact that the site served to bring

the two disputing parties together.  The site otherwise had nothing to do with the crime.

The connection between the offense and the website was tangential at best.[8]

While the websites that Mr. Sullivan previously operated may be viewed as

unseemly or distasteful by some, they were—at most—tangentially related to the offense

of conviction.  During the four years he operated stdcarriers.com (2008 to 2012), millions

of persons visited, posted, and otherwise used the site.  During that period, no similarly

hostile interaction developed with anyone who posted information on the site, or whose

information was posted there.  In other words, the offense was not a regular occurrence

---

[8] The only other tie between the offense and the stdcarriers.com website is the fact that
Mr. Sullivan used the email address <u>webmaster@stdcarriers.com</u> to send the threatening
communication to A.K.  *See* ECF 45 at ¶ 5.  However, that tenuous connection is
insufficient to justify the government's proposed occupational restriction.  A less
restrictive means of preventing any possible reoccurrence of a threatening email is
available, namely, authorizing the probation office to monitor Mr. Sullivan's use of email,
as he proposes the Court do.

**Page 12**   **REPLY MEMORANDUM IN SUPPORT OF MOTION TO MODIFY CONDITIONS OF
SUPERVISED RELEASE**

EXHIBIT 134

PAGE 9 OF 16

in his day-to-day operation of the website.   To ban Mr. Sullivan from resuming his business for the next three years would be akin to "cutting off his nose to spite his face."

The government's primary objective is to prevent Mr. Sullivan from making another threat against A. K., or another person similar to her, in the future.  Mr. Sullivan understands that.  It is for that reason that he is voluntarily agreeing that the Probation Office be allowed to monitor of all of his computer, Internet, and website activities in order to achieve that objective.

Banning Mr. Sullivan from operating stdcarriers.com, or any similar website,[9] would be an improper occupational restriction that is not directly related to the underlying offense of making a threatening communication.  *See United States v. Erwin*, 299 F.3d 1230 (10th Cir. 2002) (reversing occupational restriction not related to the offense of conviction); *United States v. Doe*, 79 F.3d 1309, 1322 (2d Cir. 1996) (same).

The defendant in *Erwin*, a felon, was arrested for illegal commercial fishing.  299 F.3d at 12331-32.  He was also found with ammunition, a violation of 18 U.S.C. § 922(g). *Id* at 1231.  The district court imposed an occupational restriction banning him from commercial fishing while on supervised release.  *Id*.  On appeal, the Tenth Circuit ruled that "[b]efore such a prohibition is imposed, the district court is required to determine

---

[9] Mr. Sullivan seeks the Court's authorization to operate his other websites, including nolimitlist.com and cyberbullyingreport.com, which he operated in conjunction with stdcarriers.com.

Page 13   REPLY MEMORANDUM IN SUPPORT OF MOTION TO MODIFY CONDITIONS OF SUPERVISED RELEASE

EXHIBIT _134_

PAGE _12_ OF _16_

that without the prohibition [the defendant] will continue to engage in criminal conduct similar to that for which he was convicted[.]" *Erwin*, 299 F.3d at 1232. The court ultimately concluded that "the district court abused its discretion in imposing the prohibition on commercial fishing" because it "did not demonstrate that *any* relationship existed between commercial fishing and unlawful conduct similar to possession of ammunition." *Id.* at 1233 (emphasis in original). As it explained, "[t]he plain wording of the guideline [U.S.S.G. § 5F1.5] dictates that there be a connection between an occupational restriction and the conduct for which the defendant was convicted." *Id* at 1232.

A similar situation arose in *United States v. Peterson,* 248 F.3d 79 (2d Cir. 2001) (per curiam). And the result was the same. The defendant there was convicted of "bank larceny based on payments made with bad checks." *Id.* at 84. However, based on a prior state conviction for incest and his accessing legal pornography on his home computers while his case was pending, the district court imposed "broad restrictions" on Peterson's computer use and Internet access while on probation. *Id.* at 82-83. Observing that the defendant had "consistently worked in computer-related jobs and . . . operated his own computer business," the Second Circuit found "the special condition . . . imposed by the District Court constituted an occupational restriction." *Id.* at 83-84. Relying on § 5F1.5, it then struck down the condition as overly broad. *Id* at 84.

Page 14    REPLY MEMORANDUM IN SUPPORT OF MOTION TO MODIFY CONDITIONS OF SUPERVISED RELEASE

EXHIBIT 134

PAGE 11 OF 16

Prohibiting Mr. Sullivan from operating his former websites would be no different

from the situations in *Erwin, Peterson,* and *United States v. Britt,* 332 F.3d 1229 (9th Cir.

2003). Like the Second and Tenth Circuits, the Ninth Circuit in *Britt* overturned a district

court's imposition of special conditions that required the defendant, convicted of

conspiracy to distribute methamphetamine, to disclose to potential business customers

his prior convictions for financial crimes. *Id* at 1230. Rejecting first the government's

argument that the conditions were "not occupational restrictions," the court held that the

notification requirements "must comply with § 5F1.5." *Id.* at 1232 (citing *Peterson,* 248

F.3d at 85-86; *Doe,* 79 F.3d at 1322-23). After noting that Britt's conviction was for a drug

crime, the Ninth Circuit then stated, "[t]here is no apparent relationship between that

conviction and the 'credit repair' business in which he is currently engaged [and] [t]he

government does not suggest that his occupation will allow him to resume participation

in the drug trade." 332 F.3d at 1232-33. "There is no reason to believe that allowing him

to run this business would allow Britt to 'continue to engage in unlawful conduct similar

to that for which [he] was convicted.'" *Id.* at 1233 (quoting U.S.S.G. § 5F1.5(a)(2)). In the

end, the court of appeals concluded "there was no reasonably direct relationship between

Britt's occupation and the conduct relevant to the offense of conviction." *Id.* at n.2.

Despite this case law, the government claims that a special condition requiring

"probation officer approval for employment is an acceptable condition of supervised

release in a case such as presented here." ECF 115 at 5. It cites a single case, *United States*

EXHIBIT ___134___

PAGE ___12___ OF ___16___

*v. Goddard*, 537 F.3d 1087 (9th Cir. 2008), in support of its assertion. *Id.* Its argument lacks

merit. *Goddard* is plainly distinguishable from the case at bar.

First, unlike Mr. Sullivan, the defendant in *Goddard* not only was convicted of

possession of child pornography, but he also "had a prior conviction for sexual battery

involving a touching of a 13-year-old girl on her way to school." 537 F.3d at 1089. Second,

the employment restrictions that Goddard challenged related directly to both his

conviction and his criminal history. The conditions prohibited him from "working in an

environment that causes regular contract with [minors], . . . working for a company

whose principle product involves [pornography], and . . . require[d] [his] employment to

be approved by the probation officer." *Id.* at 1091 (footnotes omitted). Third, and perhaps

most importantly, the conditions did "not prevent Goddard from doing *his past work*[.]"

*Id.* at 1091-92 (emphasis added).[10] In light of Goddard's conviction and prior history, it is

hardly surprising that the narrowly tailored employment restrictions were upheld on

appeal.

Because Mr. Sullivan's offense of conviction was sending a threatening

communication by email, and his computer, Internet, and website activities may be

---

[10] The Ninth Circuit held that "heightened scrutiny" was "not triggered" in *Goddard* because the employment restrictions at issue there did "not restrict Goddard's ability to work as a warehouse foreman, his occupation before he was convicted." 537 F.3d at 1092 (citation omitted). The government here, by contrast, is specifically proposing that the Court restrict Mr. Sullivan "from doing his past work." *Id.* at 1091. Heightened scrutiny is thus triggered.

EXHIBIT _134_

PAGE _13_ OF _16_

subject to unlimited monitoring by the Probation Office, there is no viable justification

for restricting his occupation by barring him from resuming the operation of his former

websites.

**C.     The Government's Proposed Special Condition 8 Would Constitute a Greater Deprivation of Liberty than Necessary.**

In addition to being unrelated to the offense of conviction, prohibiting Mr. Sullivan

from operating stdcarriers.com, or any similar website, would amount to an unnecessary

deprivation of his liberty.   Mr. Sullivan has consented to the monitoring of all of his

computer and Internet activities.   As a result, the Probation Office will be in a position to

closely monitor how he conducts his web business, detect immediately any suspicious or

unusual activity, and prevent and punish any inappropriate conduct.   These safeguards

will prevent, if not eliminate, the possibility that an interaction with some future user of

the website might deteriorate again.

The Ninth Circuit recently addressed an outright ban on Internet access in *LaCoste*,

where the defendant pleaded guilty to conspiracy to commit securities fraud.   821 F.3d at

1187.   The court vacated and remanded to the district court to "attempt to craft a more

narrowly tailored condition."   *Id.* at 1192.   Here, as in *LaCoste*, the appropriate and more

narrowly tailored condition would be to allow the Probation Office unfettered access to,

and monitoring of, Mr. Sullivan's web activity.

EXHIBIT   134
PAGE  14  OF  16

## VIII.  Mr. Sullivan Has A First Amendment Right To Resume The Operation Of His Former Websites.

While "[t]rial courts frequently impose restrictions on speech when a criminal conviction is for crimes committed during the course of expressive activity," any such restrictions must be "narrowly drawn to protect the public from a situation that might lead to a repetition of the same crime." *United States v. Terrigno*, 838 F.2d 371, 374 (9th Cir. 1988). Thus, while it may be appropriate to limit a defendant's ability to incite or encourage others to break the law, it is improper to prohibit him from expressing his personal views, no matter how disturbing those views might be. *See Porth v. Templar*, 453 F.2d 330 (10th Cir. 1971) (approving condition prohibiting defendant from inducing others through speeches to violate the law, but invalidating condition that "prohibits the expression of opinions as to invalidity or unconstitutionality" of the tax laws).

Mr. Sullivan retains his First Amendment right to freedom of expression while he is on supervised release. It would be improper, therefore, to prohibit him from operating his former websites. This is especially the case where other copycat websites, similar but inferior to stdcarriers.com, continue to operate today.[11]

---

[11] There is currently at least one active website similar to the one previously operated by Mr. Sullivan. The imitator site—STDRegistry.com—appears to mirror Mr. Sullivan's site, albeit with an inferior removal policy. *See* STDRegistry's web page, attached hereto as Exhibit C. It allows individuals to post not only information, but also photographs of other persons' sexually transmitted diseases. The catchphrase of the website is "Report the truth before it's too late!" Unlike Mr. Sullivan's site, STDRegistry.com warns, "We

EXHIBIT _134_

PAGE _15_ OF _16_

To the extent that the Court finds that the operation of stdcarriers.com, or any

similar website, would be improper if done for profit, Mr. Sullivan requests that the Court

allow him to resume the operation of his websites as a means of personal expression. *See*

*Terrigno*, 838 F.2d at 374 (upholding restrictions on defendant profiting from speaking

engagements where trial court did not restrict the defendant's "right to speak.").[12]

## IX.    CONCLUSION

Mr. Sullivan's ownership and operation of the stdcarriers.com website was not

directly related to his offense of conviction.  Accordingly, the Court should allow him to

---

do not remove reports, comments, posts and/or topics if you ask us directly. These will not be removed even if the statements are claimed to contain defamatory allegations. Only the submitter or an arbitration service can remove a post here."  Removal Policy, STD Registry, attached hereto as Exhibit D; *see also* http://www.stdregistry.com/removal-policy (last accessed August 5, 2016).  STDRegistry.com then provides links to those "arbitration services," which are actually reputation management websites that require users to pay significant sums of money to help them remove unwanted content from search results. Mr. Sullivan's website, by contrast, offers several clear methods to have information removed: (1) the person who created the post can log in and personally remove it; (2) the subject of the post can provide information, including medical records, to verify the inaccuracy of a post; or (3) the subject of the post can pay a fee to use Mr. Sullivan's reputation management web service.  In addition, whereas false information was often removed from Mr. Sullivan's site, stdcarriers.com, within 30 days, STDRegistry.com warns its users that "it can take anywhere up to 6 months to 12 months or more to ... remove the listing from our database."  Exhibit D at 3.

[12] The Ninth Circuit has not decided "whether First Amendment concerns constrain a district judge's authority to stop a defendant from posting disparaging remarks about his victims on the internet." *LaCoste*, 821 F.3d at 1191.  Unlike Mr. Sullivan, the defendant in *LaCoste* did not raise the First Amendment issue.  *Id.*  As the result, the court simply struck down the condition banning LaCoste from using the Internet as overbroad.  *Id.* ("Even if the district court could impose a supervised release condition prohibiting such conduct here, the condition it actually imposed sweeps far more broadly.").

EXHIBIT 134

PAGE 16 OF 16

resume his former occupation of operating stdcarriers.com and similar web businesses.

To the extent that the Court desires to avoid the possibility, however remote, that Mr.

Sullivan might encounter "another A.K.," he consents to unfettered monitoring of his

computer, Internet, and web activity by the U.S. Probation Office.

RESPECTFULLY SUBMITTED this 5th day of August, 2016.

/s/ Ruben L. Iñiguez
Ruben L. Iñiguez
Attorney for Defendant

/s/ Josh Ewing
Josh Ewing
Research and Writing Assistant on brief